**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **VALUE DRUG COMPANY** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | **NO.  21-3500** |
| | : | |
| **TAKEDA PHARMACEUTICALS,** | : | |
| **U.S.A., INC.,** *et al.* | : | |

## <u>MEMORANDUM</u>

**KEARNEY, J.**                                      **December 28, 2021**

A pharmacy purchaser of pharmaceutical drugs alleges a drug manufacturer with a patented brand name drug conspired to restrict output of a three of its competitors' generic product by agreeing to settle three patent infringement lawsuits it brought against three of the generic drug manufacturers.  The pharmacy alleged the brand name manufacturer gave three of its alleged infringing generic competitors with exclusive periods to sell an approved generic of its brand name drug before its patent expired. The pharmacy claims the three settlement agreements are actual evidence of one overarching joint venture conspiracy created by the brand name manufacturer designed to restrict the output of the drug and maintain higher prices and greater profits. The competing generic companies and the brand name company move to dismiss arguing the pharmacy pleads no direct or circumstantial evidence of a single agreement to conspire, no antitrust injury, and we lack personal jurisdiction over an Israeli company acquiring some of the assets and liabilities of one of the generic companies. The pharmacy responds by partially shifting to an unplead theory after reviewing the three settlement agreements but stands on the same plead facts. The pharmacy insists the three settlement agreements are still direct evidence of a single horizontal conspiracy among four competitors in a market with six or seven other admitted non-party competitors.

But the settlement agreements themselves do not demonstrate a single conspiracy among the brand and generics to provide exclusive distribution rights. They do exactly the opposite. The pharmacy argues it plead circumstantial evidence of a conspiracy from the close timing and similarity of the three settlement agreements even though the agreements depend on none of the other six or seven non-conspiring generic manufacturers seeking to sell this drug through a court order allowing their sale or otherwise. The pharmacy swears the competitors admitted adding more manufacturers will lead to a price collapse and lost profits. We also reject the pharmacy's initial thoughts concerning exercising personal jurisdiction over the Israeli purchaser based on the allegations and record adduced to date but grant its request for limited discovery.

We grant the brand name manufacturer's and three generic manufacturers' motions to dismiss for failure to plead an antitrust conspiracy but grant the pharmacy's request for leave to amend. We further grant the pharmacy's request for limited expedited discovery into our specific personal jurisdiction over the Israeli purchaser should it not amend the complaint and instead wish to continue suing only the Israeli purchaser. We decline a request to sanction the pharmacy for not amending its complaint after reviewing the three settlement agreements.

## I.    Alleged facts

Medical professionals prescribe the pharmaceutical drug Colcrys to treat gout and familial Mediterranean fever. It contains the active ingredient colchicine, which "had been used in the United States for decades before the [Food and Drug Administration]" approved Colcrys.[1] But in 2006, the Food and Drug Administration "encouraged the pharmaceutical industry to submit New Drug Applications ('NDAs') for previously unapproved drugs to facilitate the FDA evaluation of older drug products by contemporary standards."[2]

Takeda Pharmaceuticals U.S.A., Inc.'s predecessor applied for three New Drug Approvals for colchicine's treatment of familial Mediterranean fever and the treatment and prevention of gout in 2008.[3] The Food and Drug Administration approved Colcrys as "the first pharmaceutical product contain[ing] colchicine as the sole active ingredient" on July 29, 2009.[4]  It "granted Takeda's colchicine product a three-year exclusivity for the treatment of gout and seven-year exclusivity for the treatment of familial Mediterranean fever."[5] Takeda's exclusivity period ended on July 29, 2016.[6]

### Par, Watson, and Amneal file Abbreviated New Drug Applications certifying their generic versions of Colcrys do not infringe on Takeda's patents or Takeda's patents are invalid.

Once a name brand drug comes to market, generic drug companies attempt to bring an AB-rated[7] generic form of the drug to market by filing an Abbreviated New Drug Application with the Food and Drug Administration, which significantly lowers the price of the brand drug once there are "many generic competitors" on the market.[8] "[B]arriers to entry by a generic drug manufacturer are high"; they must "first formulate a generic version of the brand-name drug; conduct bioequivalence and other studies needed to support an Abbreviated New Drug Application to [the Food and Drug Administration]; file the [Abbreviated New Drug Application] and work with [the Food and Drug Administration] on any issues that arise regarding approval; and invest in manufacturing facilities for the commercialization of the product."[9] To incentivize generic drug companies "to seek approval of generic alternatives to branded drugs, the first generic manufacturer to file an [Abbreviated New Drug Application] containing a certification that the generic version does not infringe on any valid patent listed in the [Food and Drug Administration's] 'Orange Book' against the reference-listed brand drug . . . gets 180 days of protection from competition from other generic versions of the drug."[10] If a generic drug manufacturer files the Abbreviated New Drug Application certifying its drug does not infringe on

the brand name drug's patents, the brand name manufacturer can sue the generic manufacturer for patent infringement, which delays final Food and Drug Administration approval of the Abbreviated New Drug Application for up to thirty months.[11]

Par Pharmaceuticals, Inc. filed an Abbreviated New Drug Application with the Food and Drug Administration in December 2011 seeking approval for its generic version of Colcrys.[12] Par certified "all pertinent patents that Takeda listed in the [Food and Drug Administration's] Orange Book under the Colcrys [New Drug Application] were either invalid or not infringed."[13] This certification entitled Par "to a 180-day period of regulatory exclusivity during which the Food and Drug Administration would not approve other generic manufacturers to sell a generic version of Colcrys."[14] Amneal Pharmaceuticals, LLC and Watson Laboratories, Inc., along with six other generic drug companies, also filed Abbreviated New Drug Applications "seeking approval to sell generic versions of Colcrys and made similar . . . certifications that any listed patents were invalid or not infringed."[15]

### Takeda sues the generic drug companies including Par, Watson, and Amneal; launches its own Authorized Generic; and settles the litigation with Par, Watson, and Amneal.

Takeda responded by suing all the generic drug company filers for patent infringement.[16] Takeda sued Par first in August 2013, then sued the other generic drug companies at an unplead time.[17] But Takeda's Colcrys patents are allegedly "fatally weak" and "had already been found to have not been infringed . . . in litigation regarding another product called Mitigare."[18]

While proceeding with its patent infringement litigations, Takeda agreed non-party Prasco could distribute its authorized generic of Colcrys "to try to lock up generic sales for Takeda" and keep the profits "otherwise lost to generic competitors."[19] Prasco distributed the generic Colcrys "at a price just slightly lower than branded Colcrys" and "collected and remitted back to Takeda virtually all of the revenues" from generic Colcrys sales.[20]

Par obtained tentative Food and Drug Administration approval for its Abbreviated New Drug Application in February 2015.[21] Watson also obtained tentative approval in October 2015.[22] But Par and Watson still needed final approval to market their generic drug.

Value Drug Company, a pharmacy chain purchaser of pharmaceutical drugs, sees these developments as incentivizing Takeda and the generics to conspire to limit output and keep prices higher: Takeda faced devastation in profits if more generics than only its authorized generic came to market; Par faced an "unpleasant prospect of entering" the market with its generic because Prasco already had a generic in the market, forcing Par "to offer very low prices to dislodge and gain market share, depriving Par of the benefits of its 180-day exclusivity as the first [Abbreviated New Drug Application] filer"; and Watson and Amneal faced "the unattractive prospect of entering a market where Prasco and Par had already been fighting for market share for 180 days" thereby making both offer "rock-bottom prices to gain sales and share."[23]

So on the eve of trial in Takeda's patent infringement suit against Par, "Takeda, Par, Watson, and Amneal agreed to a scheme to restrain price competition to Colcrys by concertedly reducing generic Colcrys output, and agreed to share in the monopoly profits maintained thereby until January of 2024."[24] These four competitors (with six or seven others on the sidelines) entered into a single horizontal conspiracy effected through Takeda settling its patent infringement suits against Par, Watson, and Amneal under agreements presumably providing benefits to all litigants. Par and Takeda settled in November 2015, Watson and Takeda settled in January 2016, and Amneal and Takeda settled in March 2016—all with separate, written settlement agreements.[25] As for Amneal, although the parties did not execute the formal settlement agreement until March 2016, Takeda and Amneal signed a term sheet with essential terms of the settlement on December 10, 2015—shortly after Takeda and Par settled.[26]

Par and Takeda entered a distribution agreement where Par would refrain from launching its generic version of Colcrys "despite having tentative [Food and Drug Administration] approval" and "[two-and-a-half] years following entry of the agreement (*i.e.* in July of 2018) . . . Par would . . . replace Prasco as the distributor of Takeda's authorized generic Colcrys and remit back to Takeda virtually all of the revenues from sales of authorized generic Colcrys, keeping some of the revenues for itself."[27] Takeda entered into settlement agreements with Watson and Amneal whereby each would get "a defined time, believed to be between [six] and [eighteen] months in duration, to sell generic Colcrys free from competition from all other generic Colcrys sellers" in exchange for "Watson and Amneal stay[ing] off the market for several years until their defined period of marketing commenced."[28]

### *Takeda and Par's settlement agreement.*

Takeda and Par settled Takeda's claim for patent infringement against Par on November 24, 2015.[29] Takeda granted Par a non-exclusive license through a license agreement "to distribute, have distributed, market, sell, or offer for sale a generically-labeled .6 mg colchicine oral tablet product manufactured by Takeda" beginning July 1, 2018.[30] Takeda also granted Par "a fully paid-up, royalty-free, irrevocable, non-exclusive license" to sell its generic of Colcrys.[31] Par and Takeda agreed Par could begin selling its generic of Colcrys beginning on the earlier of January 1, 2024; the date a court finds the patents covering Colcrys invalid or not infringed based on a drug "substantively identical" to Par's generic of Colcrys; the date a "Third Party" begins selling its generic of Colcrys with Takeda's permission; or a date following another generic drug manufacturer launching "at risk" without permission from Takeda.[32]

### *Takeda and Watson's settlement agreement.*

Takeda and Watson settled Takeda's claim for patent infringement against Watson on January 7, 2016—two months after Takeda settled with Par.[33] Takeda and Watson

contemporaneously entered into a license agreement which is part of the settlement agreement granting Watson "a fully paid-up, royalty-free, irrevocable, non-exclusive license" to sell its generic Colcrys.[34] Watson's license is subject to additional terms, including when the license becomes effective. Takeda and Watson agreed Watson could begin selling its generic of Colcrys on the earlier of: October 15, 2020; 135 days before another generic (besides Par or Amneal) begins selling its generic of Colcrys with Takeda's permission; the date Par or Amneal begins selling their generics of Colcrys with Takeda's permission; the date a court finds the patents covering Colcrys invalid or not infringed based on a drug "substantively identical" to Watson's generic of Colcrys; the date another generic starts selling after a court determines the Colcrys patents are invalid or not infringed based on a drug "*not* substantively identical" to Watson's generic of Colcrys; or a date following another generic drug manufacturer launching "at risk" without permission from Takeda.[35]

### *Takeda and Amneal's settlement agreement*.

Takeda and Amneal settled Takeda's patent infringement litigation on March 11, 2016.[36] Takeda and Amneal contemporaneously entered into a license agreement as part of the settlement agreement granting Amneal "a fully paid-up, royalty-free, irrevocable, non-exclusive license" to sell its generic Colcrys.[37] Amneal's license is subject to additional terms, including when the license becomes effective. Takeda and Amneal agreed Amneal could begin selling its generic of Colcrys on the earlier of: October 15, 2020; the date a court finds the patents covering Colcrys invalid or not infringed based on a drug "substantively identical" to Amneal's generic of Colcrys; or the date a third party begins selling its generic of Colcrys with Takeda's permission; a date following another generic drug manufacturer launching "at risk" without permission from Takeda.[38]

Amneal received final approval for its generic of Colcrys approximately six months later in September 2016.[39]

### The alleged conspiracy comes to an unexpected end.

Takeda and the three generics negotiated an "escape clause" in each settlement agreement allowing the three generics to sell their generic Colcrys if another non-party company entered the market.[40]

The escape clause triggered a few months later.[41] Non-party generic Mylan filed and notified Takeda in September 2016 of its Abbreviated New Drug Application with a certification Takeda's patents are either invalid or not infringed.[42] Takeda sued Mylan for patent infringement in October 2016, and Takeda and Mylan settled the litigation in November 2017.[43] The settlement purportedly "permitted Mylan to launch upon a court decision invalidating the patents covering Colcrys."[44] Our Delaware colleague Judge Richard G. Andrews "issued an opinion granting a motion by [non-party] Hikma for summary judgment in patent litigation concerning another product subject to the same patents as Colcrys, which Takeda failed to appeal."[45] Mylan launched its generic of Colcrys in November 2019.[46] Mylan's entry into the market "thereby trigger[ed] the 'escape clause' in Par, Watson, and Amneal's agreements" with Takeda.[47]

### Value Drug sues Takeda, Par, Amneal, Watson, Teva Ltd., and Teva USA for violations of Section I and II of the Sherman Act.

Value Drug – a purchaser of brand Colcrys from Takeda and generic Colcrys from Prasco and Par – sued Takeda, Par, Amneal, Watson, Teva Ltd., and Teva USA for violations of Section I and II of the Sherman Act on August 5, 2021.[48] Value Drug alleges Takeda entered a single conspiracy with Par, Watson, and Amneal "to restrict output and restrain competition" by preventing AB-rated generics of Colcrys from coming to market.[49] The alleged conspiracy

depended on all defendants' participation, and Value Drug alleges the co-conspirators enjoyed "supracompetitive Colcrys profits" by virtue of this conspiracy to restrict competition.[50]

The basic features of the conspiracy derived from Takeda, Par, Watson, and Amneal agreeing: Par would not bring its own generic to market and would rather agree to market Takeda's "authorized generic" previously distributed by Prasco, but Par would not do so until two-and-a-half years after the agreement to lengthen the time Takeda enjoyed the Colcrys market competition-free; Par would pay Takeda a "large royalty"; Watson and Amneal would restrict selling their generics for several years in exchange for a defined period of time to sell their respective generic Colcrys products free from all other generic competition; and Takeda would enter license agreements with other non-conspiring generic companies to delay their entry beyond Watson and Amneal's agreed periods of competition-free sales "thereby giving the co-conspirators long periods of supracompetitive Colcrys profits."[51]

## II.   Analysis

Value Drug's presently plead claims hinge on Takeda's settlement agreements with Par, Watson, and Amneal. Par, Watson, and Amneal argue the settlement agreements directly contradict Value Drug's plead theory, Value Drug reviewed the settlement agreements but chose not to amend, and we must dismiss the Complaint because the conspiracy is implausible.

Takeda argues the principal points adopted by all competitors: (1) the conspiracy as plead is implausible on its face and directly contradicted by the settlement agreements; (2) Value Drug fails to plead sufficient facts supporting a single, horizontal conspiracy even if it plead a plausible conspiracy; and (3) Value Drug's claims are barred because the settlement agreements forming the basis of the alleged antitrust violations are merely a legitimate exercise of Takeda's patent rights under the Patent Act.[52] Amneal and Watson move to dismiss on similar grounds arguing the

settlement agreements Value Drug attempts to rely upon as evidence of the conspiracy directly contradict its theory and make the conspiracy implausible, particularly with respect to Watson and Amneal because they did not stand to receive the benefit Value Drug alleges since neither received a defined period of serial exclusivity.[53] Value Drug responds to Takeda, Watson, and Amneal's motions together, arguing: (1) it adequately pleads direct evidence of the conspiracy; (2) alternatively, it adequately pleads circumstantial evidence of the conspiracy; (3) it has adequately plead a single conspiracy; and (4) the Patent Act does not immunize Takeda's conduct in settling the patent litigation.[54]

Par moves to dismiss because Value Drug fails to plead an antitrust injury.[55] Par argues it had two independent regulatory bars to launch its generic: (1) lack of final FDA approval; and (2) Takeda's patents, which break the chain of causation.[56] Value Drug counters antitrust injury is not typically decided on a motion to dismiss, it adequately plead Par would have received earlier FDA approval to launch but for the conspiracy, Par's argument regarding Takeda's patents providing an independent barrier to launching is flawed, and even if it is not, Value Drug adequately pleads Takeda's patents are invalid or not infringed by the generic defendants.[57]

Israeli purchaser Teva Ltd. moves to dismiss for lack of personal jurisdiction.[58] Teva Ltd. argues Value Drug fails to adequately plead our personal jurisdiction and exercising personal jurisdiction over it is unconstitutional.[59] Teva USA moves to dismiss for failure to plead Teva Ltd. and Teva USA's involvement in the conspiracy or any facts regarding their liability as Watson's successor-in-interest or on a ratification theory.[60]

Because we find Value Drug's plead conspiracy is implausible on its face, we need not reach the substance of Par's and Teva USA's motions to dismiss which joined in the other defendants' arguments. We grant Takeda's, and Watson and Amneal's motions to dismiss because

Value Drug fails to plead a plausible conspiracy.[61] We defer Teva Ltd.'s motion to dismiss for lack of personal jurisdiction subject to further review following expedited jurisdictional discovery if Value Drug chooses not to amend its Complaint and intends to proceed against Teva Ltd. alone.

### A.   Value Drug does not plead a plausible single horizontal conspiracy.

Value Drug brings two claims against Takeda and the three generics—conspiracy to restrain trade in violation of 15 U.S.C. § 1 and conspiracy to monopolize in violation of 15 U.S.C. § 2—and one claim for monopolization against Takeda only in violation of 15 U.S.C. § 2.

Section 1 of the Sherman Act provides "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."[62] Section 1 antitrust plaintiffs must establish three things: (1) "a contract, combination . . . or conspiracy"; (2) an unreasonable restraint on trade; and (3) antitrust injury.[63] "[T]he existence of an agreement is the hallmark of a Section 1 claim."[64] "Instead of assigning [contract, combination . . . or conspiracy] a distinct meaning, courts have interpreted them collectively to require 'some form of concerted action' . . . in other words, a 'unity of purpose or a common design and understanding or a meeting or minds' or 'a conscious commitment to a common scheme.'"[65]

Section 2, conversely, has "sweeping language" making it unlawful to "monopolize, attempt to monopolize, or conspire to monopolize, interstate or international commerce."[66] "A Section 2 conspiracy claim has four elements: (1) an agreement to monopolize; (2) an overt act in furtherance of the conspiracy; (3) a specific intent to monopolize; and (4) a causal connection between the conspiracy and the injury alleged."[67] But a litigant may bring a Section 2 claim for monopolization as well, requiring "'(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or

11

development as a consequence of a superior product, business acumen, or historic accident.'"[68] The second element of a monopolization claim requires "the willful acquisition or maintenance of monopoly power."[69] "As this element makes clear, the acquisition or possession of monopoly power must be accompanied by some anticompetitive conduct on the part of the possessor."[70]

While Value Drug's claim for monopolization does not require the existence of a conspiracy on its face, it requires "some anticompetitive conduct" on Takeda's part to acquire or maintain the monopoly power.[71] Value Drug only alleges Takeda's "conduct" is its participation in the conspiracy with Par, Watson, and Amneal. Because we find Value Drug has not plausibly alleged a conspiracy, we also find Value Drug fails to plead a monopolization claim.[72]

In pleading a conspiracy, a plaintiff must plead "enough factual matter (taken as true) to suggest that an agreement was made."[73] A plaintiff may rely on direct or circumstantial evidence or some combination of both to plead an agreement.[74] If relying exclusively on direct evidence of conspiracy, "the complaint must plead 'enough fact to raise a reasonable expectation that discovery will reveal' this direct evidence" of illegality.[75] "And if the plaintiff alternatively expects to rest on the circumstantial evidence of parallel behavior, the complaint's statement of facts must place the alleged behavior in 'a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.'"[76] "[R]egardless of whether the plaintiff expects to prove the existence of a conspiracy directly or circumstantially, it must plead 'enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement.'"[77] We look at the conspiracy as a whole when assessing each defendants' involvement, and "[i]n short, the issue is whether the pleading delineates to some sufficiently specific degree that a defendant purposefully joined and participated in the conspiracy."[78]

1.      **Value Drug's single horizontal conspiracy as plead.**

Value Drug alleges Takeda, Par, Watson, and Amneal conspired to restrain trade and monopolize the market on the eve of Par's trial with Takeda in November 2015.[79] They allegedly agreed: Par would refrain from launching its generic of Colcrys and instead distribute Takeda's authorized generic two-and-a-half years after reaching its settlement agreement with Takeda and remit substantial royalty payments back to Takeda; "Watson and Amneal would restrict their output generic of Colcrys for several years, and then would each enjoy a defined period of time to sell their respective generic Colcrys products free from competition from all other would-be generic Colcrys makers;" and Takeda "would enter licenses with [the] other [non-conspiring] generic companies that would delay their entry beyond Watson and Amneal's agreed periods of competition-free sales, thereby giving the co-conspirators long periods of supracompetitive Colcrys profits."[80]

Value Drug swears the conspiracy has "two basic features."[81] First, Takeda and Par settled their patent litigation and "entered into a sham joint venture . . . that concealed the first part of their output restriction conspiracy."[82] Par and Takeda agreed Par would not launch its generic of Colcrys, and in July 2018—two-and-a-half years after they executed the settlement agreement— Par would become the distributor of Takeda's authorized generic of Colcrys.[83] Under this arrangement, Par would "remit back to Takeda virtually all of the revenues from sales of authorized generic Colcrys, keeping some of the revenues for itself."[84] The second feature involved Watson and Amneal.[85] They too settled their respective litigation with Takeda and entered into separate settlement agreements.[86] Takeda "struck agreements with Watson and Amneal, respectively, offering each a defined time, believed to be between [six] and [eighteen] months in duration, to sell generic Colcrys free from competition from all other generic Colcrys sellers, if Watson and

Amneal would stay off the market for several years until their defined periods of marketing commenced."[87] The conspiracy, though, had an escape clause.[88] Under Value Drug's theory, "Par, Watson, and Amneal would refrain from launching their own generic versions of Colcrys only for so long as non-conspirators did so. That is, the co-conspirators agreed that if a non-conspiring seller of generic Colcrys entered the market, Par, Watson, and Amneal could do so . . . Par's selling Takeda's authorized generic Colcrys avoided this escape clause."[89] Value Drug continues: "This escape clause, and its necessary implication that the co-conspirators were willing to restrict their own output only so long as non-conspirators were doing so, too, illustrates the interdependence of the promises of the co-conspirators, the existence of the conspiracy, the fact that the output restriction was against the unilateral economic interests of the conspirators and was only in their joint conspiratorial interests, and demonstrates the singular nature of the conspiracy."[90]

Value Drug alleges this arrangement benefitted all the co-conspirators.[91] According to Par "[t]he distribution agreement between Takeda and Par . . . provides powerful incentives to ensure that the parties preserve the two-entrant market."[92] And Par itself purportedly explained the logic behind the conspiracy: "[A market with] a single branded drug (Takeda's Colcrys) and a single generic version (Par's authorized generic) only functions if the market for Colcrys-equivalent colchicine is limited to those two products. [] Although a drug market can maintain price stability with a single generic version of a drug on the market, multiple entrants often product a market-wide price collapse with mass renegotiation and cancellation of supply agreements. [] The distribution agreement between Takeda and Par recognizes this dynamic and provides powerful incentives to ensure that the parties preserve the two-entrant market."[93] Par also "asserted that even the entry of a single additional competitor would cause its distribution joint venture with Takeda 'to lose approximately 97 million in annual revenue;'" and "with 'two or three other generic

ANDA filers enter[ing] the market,' the joint venture would lose even more, because '[a]s additional generic versions of Colcrys enter the market, Par would be forced to swiftly reduce prices to maintain even a portion of its market share.'"[94] Value Drug pleads each defendant had no unilateral interest in this arrangement, and "[t]he conduct among [Takeda, Par, Amneal, and Watson] only makes economic sense if there was an agreement among the four of them to restrain their respective generic and authorized-generic output and prevent the price collapse that Par so vividly described."[95] In other words, under Value Drug's theory, the conspirators agreed Par, Watson, and Amneal would stay off the market to each enjoy defined periods of competition-free sales to avoid "the price collapse" Par so vividly described when more than a brand drug and one generic drug is on the market.[96]

Value Drug alleges this conspiracy "restricted output of generic Colcrys, kept Colcrys prices at supracompetitive levels, and delayed their fall to competitive levels."[97] Value Drug alleges the conspiracy "was very profitable to both Takeda and Par" even though "Watson and Amneal did not get to enjoy the fruits of the conspiracy."[98] Value Drug alleges Takeda "earned approximately $1 billion more than it would have had it faced generic competition," "Par expected to earn approximately $50-80 million more than it would absent the conspiracy," and "Watson and Amneal each could have expected to earn approximately $12-36 million more during their respective periods as the only generic seller on the market than they would have earned absent the conspiracy."[99]

### 2.    Value Drug pleads no direct evidence of the conspiracy.

"Allegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate" to plead a conspiracy.[100] Direct evidence is "evidence that is explicit and requires no inferences to establish the proposition or conclusion being arrested" such as "a document or

conversation explicitly manifesting the existence of the agreement in question."[101] Value Drug argues it offers two forms of direct evidence—the settlement agreements themselves and defendants' judicial admissions in a different litigation.[102]

Value Drug cites a string of cases purportedly supporting its argument the individual, bilateral settlement agreements are direct evidence of the single, horizontal conspiracy among Takeda, Par, Watson, and Amneal.[103] Value Drug fails to appreciate why these cases are distinguishable from what it pleads here. For example, Value Drug cites to one of Judge Goldberg's opinions in the *King Drug Co. of Florence v. Cephalon, Inc.* litigation.[104] Judge Goldberg considered motions for summary judgment on whether individual settlement agreements between the brand and generic defendants *themselves* violated antitrust principles because they *individually* contained large and unjustified reverse settlements following our Supreme Court's holding in *Actavis*.[105] Value Drug seizes on Judge Goldberg's footnote "[p]laintiffs have presented direct evidence of concerted action through the settlement agreements between Cephalon and each of the Generic Defendants, and Defendants have not challenged Plaintiffs' ability to meet the concerted action requirement on these claims."[106] But Value Drug fails to acknowledge the concerted action Judge Goldberg is discussing is *not* concerted action among the brand and *all* of the generics, it is concerted action between the brand and *each* of the generics with respect to the individual settlement agreements raising antitrust concerns. Judge Goldberg addressed several agreements; Value Drug alleges one.

Judge Thrash in *In re Androgel Antitrust Litigation (No. II)* considered whether individual settlement agreements between the brand and each generic raised antitrust concerns as a reverse payment settlement on a motion for summary judgment.[107] One of the generics moved for summary judgment arguing the plaintiffs failed to demonstrate a conspiracy to restrain trade in

violation of Sections 1 and 2 of the Sherman Act.[108] Judge Thrash observed both claims "require the same threshold showing—the existence of an agreement to restrain trade" and "[a] written contract satisfies this requirement 'only if it embodies an agreement to unlawfully restrain trade.'"[109] Judge Thrash concluded the settlement agreements constituted direct evidence of a conspiracy because "the settlement agreements specifically address the conduct the Plaintiffs argue is unlawful."[110] Judge Thrash reasoned: "The parties negotiated and agreed that in exchange for dropping the patent litigation, providing some services, and delaying generic introduction until 2015, the Generics would receive compensation. Whether that common objective—dropping the patent litigation in exchange for compensation—was an illegal restraint of trade is a separate question. But if it was, then the settlements are clear, direct evidence of an agreement to unlawfully restrain trade."[111] In *In re Androgel*, the very conduct purportedly constituting the antitrust violation—"dropping the patent litigation in exchange for compensation" in the form of a reverse payment—appeared in the terms of each individual written settlement agreement between the brand and the generic manufacturer. Thus, as Judge Thrash aptly reasoned, if a jury found this conduct to be in violation of the Sherman Act, the settlement agreements constituted *direct evidence* of the conspiracy between the brand and each individual generic as they memorialized the very agreement which violated the Sherman Act.

This is not what we have here. Value Drug is not challenging the separate bilateral settlement agreements as individually violative of the Sherman Act.[112] Value Drug pleads a single, horizontal antitrust conspiracy among Takeda, Par, Watson, and Amneal. The bilateral settlement agreements are not direct evidence of this alleged conspiracy. We are persuaded by another Judge Goldberg opinion in the *King Drug Co. of Florence, Inc. v. Cephalon, Inc* litigation.[113] Judge Goldberg separately considered whether four individual, bilateral reverse payment settlement

agreements executed between the brand drug Cephalon and the generic defendants "were the product of an overall antitrust conspiracy between all of the Defendants" on a motion for summary judgment.[114] As we have here, Judge Goldberg observed "[t]he motions at issue do not concern the legality of the individual, bilateral settlement agreements between Cephalon and each Generic Defendant. What is at issue is Plaintiffs' claim that the separate settlement agreements were in fact the manifestation of a horizonal conspiracy between all Defendants—with Cephalon at the center—to restrain trade in the modafinil market."[115] Judge Goldberg found the individual, bilateral settlement agreements are not direct evidence of an overall antitrust conspiracy.[116] There, the plaintiffs argued the settlement agreements themselves, which contained substantially similar language and structure, constituted direct evidence.[117] Judge Goldberg rejected this argument, reasoning, "[t]he settlement agreements themselves are individual agreements, not global agreements amongst all Defendants. Plaintiffs are unable to point to any direct evidence that the Generics agreed amongst themselves, let alone that such overall agreement also included Cephalon. Indeed, each agreement runs only between Cephalon and a single Generic. While Plaintiffs are correct that the settlements contain similar terms, and it could be argued that this similarity is evidence of an overall conspiracy, that is classic circumstantial, not direct evidence."[118]

Value Drug pleads the generics individually settled their patent infringement litigations with Takeda around the same time and with bilateral settlement agreements containing similar structure and terms, purportedly manifesting an overarching single, horizontal conspiracy among Takeda, Par, Watson, and Amneal.[119] Value Drug conceded at oral argument there is no provision in the settlement agreements—beside in Watson's agreement which references Par and Amneal's generic Colcrys product—providing *direct* evidence of an agreement among Takeda, Par, Watson,

and Amneal to restrict generic Colcrys output.[120] Value Drug further conceded "conspirators normally don't lay out and specifically say, hey, this is what I'm doing."[121] But this is exactly the type of "smoking gun" evidence Value Drug needs if it intends to rely on the settlement agreements as *direct evidence* of a conspiracy.[122] There is simply no direct evidence of an antitrust conspiracy in the individual settlement agreements themselves. The mere fact Watson's agreement mentions two other products may give rise to an *inference* Watson, Par, and Amneal knew of each other's agreements' terms and somehow fell into an overarching output restriction conspiracy. But this is a conclusion requiring us to *infer* something and thus is *not* direct evidence; it is "classic circumstantial" evidence just like Judge Goldberg reviewed on a summary judgment record.

Value Drug also argues it provides direct evidence of the overarching conspiracy in the form of judicial admissions by Par in front of Judge Andrews.[123] This too fails to carry the day for Value Drug. The statements by Par only address Par and Takeda's distribution agreement and the benefits provided to Par and Takeda by maintaining a two-drug market.[124] The statements do not address Watson and Amneal or their agreement and involvement in this alleged overarching conspiracy among Takeda, Par, Watson, and Amneal. Value Drug's reliance on the statements would require us to draw inferences Takeda, Par, Watson, and Amneal entered an overarching conspiracy among each other from Par's statements about its agreement with Takeda and the benefits it draws from it. This reach is classic circumstantial evidence, not direct.

Value Drug pleads no direct evidence of a conspiracy because neither the settlement agreements nor Par's statements are direct evidence of the single, horizontal conspiracy among Takeda, Par, Watson, and Amneal.

### 3.    Value Drug pleads no circumstantial evidence of the conspiracy.

Plaintiffs may plead an anti-competitive conspiracy violating federal law through circumstantial evidence.[125] But mere allegations of parallel conduct are not enough, nor are allegations of "conscious parallelism."[126] "In order 'to avoid deterring innocent conduct that reflects enhanced, rather than restrained, competition,' . . . and in order to enforce the Sherman Act's requirement of an agreement, the Supreme Court has required that 'a § 1 plaintiff's offer of conspiracy evidence must tend to rule out the possibility that the defendants were acting independently."[127] "Some courts have denominated these facts, the presence of which may indicate the existence of an actionable agreement, as 'plus factors'" and although not exhaustive, our Court of Appeals recognizes three such plus factors: (1) motive to enter the conspiracy; (2) evidence defendants acted contrary to their interests; and (3) evidence implying a traditional conspiracy.[128] "[P]lus factors are simply circumstances in which the inference of independent action is less likely than that of concerted action."[129]

Value Drug argues it adequately pleads circumstantial evidence of a conspiracy because it pleads conscious parallel conduct, motive to agree, and the conspiring defendants acted contrary to their economic interests.[130] Takeda, Watson, Amneal, and Par counter the conspiracy is implausible, and Value Drug fails to adequately plead circumstantial evidence of a conspiracy nonetheless. We need not decide whether Value Drug plausibly pleads consciously parallel conduct because its conspiracy *as plead* is admittedly implausible belying any inference of concerted action. But we grant Value Drug leave to amend should it be able to plead its later-argued theory consistent with Rule 11.

We again start with Value Drug's plead conspiracy. Value Drug's plead purpose of the conspiracy is for "the four [conspirators] to restrain their respective generic and authorized-generic

output **and prevent the price collapse that Par so vividly described**"—*i.e.*, the price collapse which occurs when there are more than two entrants (one brand and one generic of a drug) in the market—in order to enjoy and maintain supracompetitive profits.[131] To achieve this purpose, Takeda, Par, Watson, and Amneal agreed to consistently maintain a two-entrant system until January 2024, with Par first enjoying exclusivity well past its 180-day exclusivity provided as the first Abbreviated New Drug Application filer, and then Watson and Amneal each enjoying successive periods of exclusivity—something neither would otherwise enjoy since neither filed their Application first.[132] Understanding other non-conspirator generics could also come to market, the four competitors purportedly agreed Takeda would provide them licenses to enter the market after Watson and Amneal had their exclusivity period.[133] The competitors also purportedly agreed, though, if a non-conspiring generic came to market, all of them could enter too; in other words, they would only restrict their output if the non-conspirator generics did so too.[134] In so doing, they restricted competition and stood to gain supracompetitive profits.[135]

But what Value Drug pleads is belied by the settlement agreements Value Drug attempts to rely on as circumstantial evidence of the conspiracy. It is not disputed Watson and Amneal did not have a defined period of exclusive sales. The purported conspiracy (as best we can tell based on the allegations with all inferences in Value Drug's favor) really worked this way:

- Par agreed to be Takeda's distributor of its authorized generic from July 1, 2018 through the earlier of June 30, 2022 (or the date Par launches its own generic of Colcrys or any other single-ingredient oral colchicine product other than Takeda's or its generic of Colcrys);[136]

- Par also agreed with Takeda it could launch its own generic of Colcrys on the earlier of January 1, 2024; the date a court finds the patents covering Colcrys invalid or not infringed

based on a drug "substantively identical" to Par's generic of Colcrys; the date a "Third Party" begins selling its generic of Colcrys with Takeda's permission; or a date following another generic drug manufacturer launching "at risk" without permission from Takeda.[137] Third Party *does not* except Watson and Amneal; rather, it means "any person other than a Party or an Affiliate to a Party."[138]

- Watson agreed with Takeda it could launch its own generic of Colcrys on the earlier of: October 15, 2020; 135 days before another generic (besides Par or Amneal) begins selling its generic of Colcrys with Takeda's permission; the date Par or Amneal begins selling their generics of Colcrys with Takeda's permission; the date a court finds the patents covering Colcrys invalid or not infringed based on a drug "substantively identical" to Watson's generic of Colcrys; the date another generic starts selling after a Court determines the Colcrys patents are invalid or not infringed based on a drug "*not* substantively identical" to Watson's generic of Colcrys; or a date following another generic drug manufacturer launching "at risk" without permission from Takeda.[139]

- And Amneal agreed with Takeda it could launch its own generic of Colcrys on the earlier of: October 15, 2020; the date a court finds the patents covering Colcrys invalid or not infringed based on a drug "substantively identical" to Amneal's generic of Colcrys; the date a third party begins selling its generic of Colcrys with Takeda's permission; or a date following another generic drug manufacturer launching "at risk" without permission from Takeda.[140]

Thus, drawing all inferences in favor of Value Drug but reviewing the agreements Value Drug itself relies on to state its claim, we know:

- Par and Takeda would be the only two sellers on the market, with Takeda distributing its branded Colcrys and Par distributing Takeda's authorized generic, from July 1, 2018 to October 15, 2020 when Watson and Amneal entered the market with their generic products; upon their joint entry, Watson and Amneal would cause the "price collapse" with four market entrants—which, according to Value Drug's own pleading, would cause the generics to "swiftly reduce prices to maintain even a portion" of the market share.

- If Watson's entry date of 135 days before another generic (besides Par or Amneal) got triggered, Watson still would not have a period of exclusivity. Rather, both Par and Amneal could come in with their generics.[141] Thus, the market would have: Takeda's brand Colcrys; Takeda's authorized generic of Colcrys; Par's generic Colcrys; Watson's generic Colcrys; and Amneal's generic Colcrys.[142]

- And, as Value Drug pleads, if a non-conspirator came into the market, Par, Watson, and Amneal could also come in then.[143]

We next turn to the purported "Second Wave" theory of conspiracy Value Drug did not plead but raised at oral argument and in its briefing. Value Drug argues the actual unplead purpose of the conspiracy is to "order their market entry" to compete against three generics rather than the potential nine, and thus avoid "the looming Second Wave" of generics which would cause an even larger price collapse than what occurs when there are three generics in the market.[144] In other words, Takeda, Par, Watson, and Amneal did not conspire to totally restrict their output in exchange for defined periods of exclusivity in a two-entrant market and supracompetitive profits to be shared among themselves (as plead); they instead conspired to restrict their output to compete only against *each other* for defined periods of time, rather than all nine generics which could have

been on the market. But Value Drug fails to plead facts supporting this theory and effectively concedes its as-plead theory is implausible by not defending it.[145]

Value Drug's conspiracy *as plead* is implausible because in any of these scenarios, the admitted price collapse occurs. Value Drug concedes this result.[146] Rather than doubling down on its theory the four competitors agreed to this scheme to prevent the inevitable price collapse which occurs when "even . . . a single additional" generic enters the market and disrupts the high prices commanded in a two-entrant market, Value Drug argues the purpose of the conspiracy is actually to prevent the *further* price collapse which would occur from the "looming Second Wave" of generic manufacturers also trying to take their generic of Colcrys to market.[147] But Value Drug cannot plead one implausible conspiracy—a conspiracy in which each conspirator joined in order to enjoy defined, competition-free periods of sales in a two-entrant market[148]—and argue because another unplead conspiracy is plausible we should not dismiss its plead implausible allegations.[149]

Value Drug pleads itself out of court by focusing the plead motives of the four competitors to reduce generic output "to prevent the price collapse that Par so vividly described"—*i.e.*, the price collapse which occurs when even one other generic enters the two-entrant market.[150] The settlement agreements themselves preclude Watson and Amneal from selling their generics in a two-entrant market and rather demonstrate the price collapse Par described *will* happen when one of the four competitors brings its generic to market because all three generics, and possibly Takeda's authorized generic, can be sold at once. As plead, we discern no motive for the competitors to enter a *single*, *horizontal* conspiracy among all of them to cause the very price collapse they allegedly conspired to avoid.[151] This theory makes no economic sense and forecloses an inference of concerted action among the four competitors.[152]

We dismiss Value Drug's plead claims against Takeda, Par, Watson, Amneal, and Teva USA with leave to amend.

**B.    We defer ruling on Teva Ltd.'s motion to dismiss for lack of personal jurisdiction and allow limited expedited jurisdictional discovery.**

Teva Ltd. moves to dismiss Value Drug's complaint arguing we do not enjoy personal jurisdiction over it as an Israeli company with its principal place of business in Israel.[153] Value Drug responds we enjoy personal jurisdiction over Teva Ltd. under Pennsylvania's long arm statute, the Clayton Act (15 U.S.C. § 22), and Federal Rule of Civil Procedure 4(k)(2).[154] Value Drug also argues exercising jurisdiction—either general or specific—is constitutional.[155] In the alternative, Value Drug asks for jurisdictional discovery. We disagree with Value Drug it has adequately plead or proffered adequate evidence our exercise of jurisdiction over Teva Ltd. is constitutional. But we grant Value Drug limited jurisdictional discovery on one plead theory of personal jurisdiction.

**1.    Value Drug's pleading of personal jurisdiction over Teva Ltd.**

Value Drug knowingly sued a foreign company with a foreign principal place of business and yet failed to plead barely a fact regarding our personal jurisdiction over it.[156]

Value Drug bases our personal jurisdiction over Teva Ltd. on four sparce allegations: (1) "Teva Ltd. is successor-in-interest to Watson"; (2) "On July 26, 2015 Teva Ltd. purchased Watson and, as part of that purchase, assumed all of Watson's liabilities"; and (3) "Moreover, Teva Ltd. ratified Watson's conduct challenged herein"; (4) "Each defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States, including in this district. The scheme and conspiracy have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this district."[157]

**2.      Value Drug fails to plead or proffer adequate evidence to establish we enjoy personal jurisdiction over Teva Ltd. but we allow it limited jurisdictional discovery should it decline to timely amend its complaint.**

"'[T]he burden of demonstrating the facts that establish personal jurisdiction,' falls on the plaintiff . . . and 'once a defendant has raised a jurisdictional defense,' the plaintiff must 'prov[e] by affidavits or other competent evidence that jurisdiction is proper.'"[158] When, as here, no party requests an evidentiary hearing "'the plaintiff[s] need only establish a prima facie case of personal jurisdiction.'"[159] We are required to "'accept the plaintiff's allegations as true, and . . . to construe disputed facts in favor of the plaintiff.'"[160] "Of course, by accepting a plaintiff's facts as true when a motion to dismiss is originally made, a court is not precluded from revisiting the issue if it appears that the facts alleged to support jurisdiction are in dispute."[161]

"Pennsylvania's long-arm statute gives its courts jurisdiction over out-of-state defendants to the maximum extent allowed by the U.S. Constitution."[162] Federal Rule of Civil Procedure 4(k)(2) provides "[f]or a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consisted with the United States Constitution and laws."[163] The Clayton Act, which allows nationwide service of process, permits us to consider whether we have personal jurisdiction over Teva Ltd. "on the basis of [its] aggregate contacts with the United States as a whole" under the Fifth Amendment's Due Process clause.[164] Regardless of which statute or rule we operate under, exercising personal jurisdiction over Teva Ltd. must still be constitutional. The parties dispute whether exercising jurisdiction is constitutional and what standard to apply. We apply the same analysis applied to a personal jurisdiction analysis under the Fourteenth Amendment.[165]

### a.    We do not enjoy general personal jurisdiction over Teva Ltd.

Value Drug first argues we enjoy general jurisdiction over Teva Ltd. based on Teva Ltd.'s "continuous and systematic contacts" with the United States or alternatively as Teva USA's alter ego. At the outset, we reject Teva Ltd.'s argument and evidence proffered purportedly supporting its argument we may exercise jurisdiction over Teva Ltd. under an alter ego theory.[166] Value Drug does not plead we have personal jurisdiction over Teva Ltd. under an alter ego theory. It cannot now attempt to rely on an unplead theory through briefing.[167]

We consider whether we otherwise have general jurisdiction over Teva Ltd. Our inquiry is whether the "corporation's 'affiliations with the State are so 'continuous and systematic' as to render [it] essentially at home in the forum State.'"[168] The Supreme Court recently reiterated the standard for general jurisdiction:

> A state court may exercise general jurisdiction only when a defendant is "essentially at home" in the State. General jurisdiction, as its name implies, extends to "any and all claims" brought against a defendant. Those claims need not relate to the forum State or the defendant's activity there; they may concern events and conduct anywhere in the world. But that breadth imposes a correlative limit: Only a select "set of affiliations with a forum" will expose a defendant to such sweeping jurisdiction. In what we have called the "paradigm" case, an individual is subject to general jurisdiction in her place of domicile. And the "equivalent" forums for a corporation are its place of incorporation and principal place of business.[169]

Value Drug concedes Teva Ltd.'s state of incorporation and principal place of business is Israel.[170] Value Drug's argument apparently seizes on our Supreme Court's language in *Daimler* leaving open the possibility of exercising general jurisdiction over a defendant "in an exceptional case . . . [when] a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home in that State."[171] But "it is incredibly difficult to establish general jurisdiction [over a corporation] in a forum *other* than the place of incorporation or principal place of business."[172]

Value Drug argues we have general jurisdiction due to Teva Ltd.'s extensive contacts with the United States.[173] We are unpersuaded by Value Drug's citations to pre-*Daimler* cases and see no "exceptional reason" to exercise general personal jurisdiction over Teva Ltd.

> **b.    We defer ruling on whether we enjoy specific personal jurisdiction over Teva Ltd. following limited jurisdictional discovery.**

Value Drug alternatively argues we may exercise specific jurisdiction over Teva Ltd. Specific jurisdiction requires: (1) minimum contacts—"some act by which [the defendant] purposefully avails itself of the privilege of conducting activities within the forum state"; (2) "[t]he plaintiff's claims . . . 'must arise out of or relate to the defendant's contacts' with the forum'"; and (3) exercising jurisdiction does not offend "traditional notions of fair play and substantial justice.'"[174] Value Drug relies on three theories: (1) Teva Ltd.'s contacts with the United States are sufficient to exercise specific jurisdiction; (2) we can impute Watson's contacts to Teva Ltd. because Teva Ltd. is Watson's successor-in-interest; and (3) we can impute Watson's contacts to Teva Ltd. because Teva Ltd. ratified its conduct.[175]

We grant limited jurisdictional discovery on Value Drug's first theory.[176] Value Drug pleads "[e]ach defendant has transacted business, maintained substantial contacts, and/or committed overt acts in furtherance of the illegal scheme and conspiracy throughout the United States."[177] Our Court of Appeals has held this bare conclusory pleading is "clearly frivolous" and not warranting of jurisdictional discovery.[178] But in response to Teva Ltd.'s motion to dismiss, Value Drug proffered evidence of Teva Ltd.'s contacts with the United States.[179] What Value Drugs did not do is provide evidence or argument the claims before us now arise from or relate to Teva Ltd.'s contacts with the United States.[180] We are satisfied based on the record before us, including Value Drug's Complaint and proffer of evidence in response to Teva Ltd.'s motion to

dismiss, Value Drug's jurisdictional discovery will not be a fishing expedition but rather a targeted inquiry into whether the claims here arise from or relate to Teva Ltd.'s contacts with the United States.[181]

We reject Value Drug's theory of personal jurisdiction under the successor-in-interest and ratification theories.[182] Value Drug does not plead or proffer facts supporting its legal conclusion "Teva Ltd. ratified Watson's conduct challenged herein."[183] We have no basis to provide discovery when we have no facts supporting this theory.

We similarly reject Value Drug's successor liability theory of personal jurisdiction as plead. "[U]nder Pennsylvania law, the acts of a predecessor corporation may be attributed to its successor for purposes of determining whether jurisdiction over the successor is proper."[184] "Accordingly, jurisdiction is established if the successor corporation may be held liable under Pennsylvania's law of successor liability."[185] Value Drug relies on the "express assumption of liability" exception to Pennsylvania's general rule of no successor liability.[186] The parties dispute whether Value Drug pleading Watson continues to exist precludes a finding of successor liability under Pennsylvania law.[187] In *In re Suboxone Antitrust Litigation*, Judge Goldberg considered whether a defendant could be liable as a successor-in-interest under Pennsylvania law when the plaintiff argued the defendant expressly assumed liabilities.[188] Judge Goldberg found it could not for three reasons: (1) the agreement did not expressly transfer liabilities to a successor corporation; (2) "the continued existence of original entity precludes successor liability;" and (3) the plaintiffs failed to allege the original entity had any liability, regardless.[189] Judge Goldberg found: "[i]t is well established that '[i]f the original entity still exists . . . there is no successor, and therefore no successor liability.'"[190] He continued: "[a]t least one district court has concluded that, under Pennsylvania law, the 'cessation of ordinary business operations' factor may be satisfied when the

29

predecessor does not dissolve or completely cease to exist, but rather is reduced to an assetless shell."[191] "Where, however, the original entity is not an assetless shell and does not completely cease ordinary operations, successor liability is precluded."[192]

The plaintiffs in *In re Suboxone* argued it did not matter the predecessor entity still existed, relying on a Massachusetts case applying Massachusetts law.[193] Judge Goldberg found he need not consider the plaintiffs' argument because the Massachusetts case decided under Massachusetts law which Plaintiffs relied on "is inapposite given [his] finding that there was no assumption of liability."[194] Value Drug attempts to distinguish the case on this basis arguing Judge Goldberg did not decide whether the predecessor entity must cease to exist when there is an express assumption of liability.

But we are not persuaded. Judge Goldberg found three independent reasons to deny successor liability—one of which included the predecessor entity still existed. We are persuaded by the analysis presented by Judge Goldberg and other judges to have considered this issue.[195] Value Drug pleads Watson still exists, precluding a finding of successor liability under Pennsylvania law, and thus precluding us from imputing Watson's contacts for purposes of jurisdiction as plead.[196]

We reject Value Drug's argument we enjoy general jurisdiction over Teva Ltd. or we can impute Watson's contacts to Teva Ltd. under a successor-in-interest or ratification theory as plead. But we grant limited jurisdictional discovery on whether Value Drug's claims arise from or relate to Teva Ltd.'s contacts with the United States. Understanding Value Drug may amend its Complaint and plead other theories of our personal jurisdiction for Teva Ltd. to the extent possible under Rule 11, we defer jurisdictional discovery until after Value Drug can amend.

### 3.      We deny Watson and Amneal's request for sanctions.

Watson and Amneal move for sanctions against Value Drug in the form of their fees in prosecuting their motion to dismiss under 28 U.S.C. § 1927 if we dismiss Value Drug's complaint with leave to amend.[197] We decline to sanction Value Drug at this stage. Its pleading is inaccurate and possibly inartful; it is not frivolous and there is no basis to find bad faith or intentional misconduct.

Congress in section 1927 provides "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."[198] Watson and Amneal argue they are entitled to their fees for moving to dismiss a complaint which Value Drug knew contained false allegations after receiving the settlement agreements and then consciously choose not to amend. We disagree.

Our Court of Appeals instructs sanctions under 28 U.S.C. § 1927 are limited to when an attorney has "(1) multiplied proceedings; (2) unreasonably and vexatiously; (3) thereby increasing the cost of the proceedings; (4) with bad faith or with intentional misconduct."[199] The sanctions are "intended to deter an attorney from *intentionally* and unnecessarily delaying judicial proceedings, and they are limited to the costs that result from such delay," but our Court of Appeals cautions "courts should exercise [this sanctioning power] only in instances of a serious and studied disregard for the orderly process of justice."[200] Congress's allowance of fees in section 1927 is to be construed narrowly "and with great caution so as not to stifle the enthusiasm or chill the creativity that is the very lifeblood of the law."[201] "Consequently, sanctions may not be imposed

31

under § 1927 absent a finding that counsel's conduct resulted from bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal."[202]

Value Drug's choice to stand on its Complaint and defend against the motions to dismiss is not so clearly frivolous, unreasonable, or vexatious to rise to the level of bad faith warranting sanctions. We decline to sanction Value Drug.

## III. Conclusion

Pharmacy chain Value Drug alleges Takeda Pharmaceuticals, manufacturer of a brand name Colcrys—a drug approved by the Food and Drug Administration for the treatment and prevention of gout and familial Mediterranean fever—entered a single conspiracy with generic drug manufacturers Par, Watson, and Amneal to restrict generic Colcrys output in exchange for defined periods of exclusive sales and thus extended periods of supracompetitive profits. But Value Drug fails to plead a plausible single horizontal conspiracy among the four competitors based on settlement agreements. The settlement agreements are to the contrary on their face. We must dismiss its Complaint based on this theory with leave to amend if Value Drug can plead an alternative theory. Value Drug similarly fails to plead multiple theories of personal jurisdiction over an Israeli purchaser of some of Watson's assets but skates by with a bare pleading and a proffer of evidence of one theory entitling it to limited specific jurisdictional discovery before dismissal. We need not reach the substance of Par and Teva USA's alternative arguments for dismissal with an understanding Value Drug is now fully apprised of both entity's arguments should it amend consistent with our Order.

---

[1] ECF Doc. No. 1 ¶ 28. Colchicine is "a very old drug" which doctors used to treat gout "for a very long time." *Id.* ¶ 30. The ancient Greeks used colchicine to treat gout more than two thousand years ago. *Id.* Dr. Stephen Goldfinger "reported successful use of colchicine" to treat familial Mediterranean fever in 1972. *Id.* Gout is "a type of severe arthritis often characterized by painful

'flares' (severe and sudden attacks of pain, redness, inflammation, and tenderness in joints) resulting from the build-up of uric acid)." *Id.*

[2] *Id.* ¶ 28.

[3] *Id.* ¶ 32.

[4] *Id.* ¶¶ 29, 32.

[5] *Id.* ¶ 32.

[6] *Id.*

[7] "An AB rating means that the generic drug is pharmaceutically equivalent and bioequivalent to the corresponding reference-listed brand drug." *Id.* ¶ 37. "An AB-rating is particularly significant because . . . pharmacists may (an in many states, must) substitute an AB-rated generic version of a drug for the brand-name drug automatically at the pharmacy counter, without seeking or obtaining permission from the prescribing physician." *Id.*

[8] *Id.* ¶¶ 33–36.

[9] *Id.* ¶ 39.

[10] *Id.* ¶ 40.

[11] *Id.* ¶ 41.

[12] *Id.* ¶¶ 39 (defining "ANDA"), 42. The application number is 203976. *Id.* ¶ 42.

[13] *Id.* ¶¶ 40, 42.

[14] *Id.* ¶ 42.

[15] *Id.* ¶ 43. Value Drug conceded this allegation is not accurate during oral argument because all eight generic filers did not file at the same time; eight generic manufacturers filed over the course of the allegations in the complaint, presumably from 2011 to 2019. ECF Doc. No. 148, Tr. 23:17–24:2.

[16] ECF Doc. No. 1 ¶ 44.

[17] *Id.*

[18] *Id.* ¶ 45. While Value Drug places this allegation right after its allegation "Takeda sued Par first, in August 2013," thereby suggesting this ruling came out *before* Takeda sued Par and the other generics, Value Drug conceded at oral argument this ruling did not come out before Takeda filed the lawsuits for patent infringement against the generics. It rather came out in May 2015. ECF Doc. No. 148, Tr. 56:17–57:14.

[19] ECF Doc. No. 1 ¶ 49.

[20] *Id.* ¶¶ 50–51.

[21] *Id.* ¶ 46

[22] *Id.* ¶ 47.

[23] *Id.* ¶ 53.

[24] *Id.* ¶ 54.

[25] ECF Doc. No. 123–123-2. We may review the settlement agreements on a motion to dismiss without converting it to a motion for summary judgment because the settlement agreements are integral and explicitly relied upon in Value Drug's Complaint. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings . . . However, an exception to the general rule is that a "document integral to or explicitly relied upon in the complaint" may be considered "without converting the motion [to dismiss] into one for summary judgment." (internal citations omitted) (modification in original)); *see also Est. of Roman v. City of Newark*, 914 F.3d 789, 796 (3d Cir. 2019) ("'Although we examine the "complaint, exhibits attached to the complaint, [and] matters of public record,' . . . we can also consider documents 'that a defendant attaches as an exhibit to a motion to dismiss,' . . . if they are "undisputedly authentic" and "the [plaintiff's] claims are based [on them]." (internal citations omitted)), *cert. denied*, 140 S. Ct. 82 (2019), *and cert. denied*, 140 S. Ct. 97 (2019).

[26] ECF Doc. No. 123-2 at 45 (dates term sheet executed).

[27] ECF Doc. No. 1 ¶ 55.

[28] *Id.* ¶ 56.

[29] ECF Doc. No. 123, Ex. 1, at 2.

[30] *Id.* at 16 § 1.1 ("Takeda hereby grants to Par a non-exclusive license, with the right to sublicense to an Affiliate, under the Licensed Patents, to distribute, have distributed, market, sell, and offer for sale a generically-labeled .6 mg colchicine oral tablet product manufactured and supplied by Takeda pursuant to the Takeda NDAs ('*Licensed AG Product*'), subject to the terms set forth in the Distribution and Supple Agreement attached as Exhibit B hereto, and solely during the following period (the '*AG License Term*'): July 1, 2018, through the earlier of: June 30, 2022; or The date Par launches Par's ANDA Product; or The date Par launches any single-ingredient oral colchicine product other than the Licensed AG Product or Par's ANDA Product.").

[31] *Id.* at 16 § 1.2 ("Subject to Paragraph 1.3 below, Takeda hereby grants Par and its respective Affiliates a fully paid-up, royalty-free, irrevocable, non-exclusive license under the Licensed Patens and any other intellectual property rights owned or controlled by [Takeda] and its respective Affiliates as of the Effective Date or at any time in the future, which Licensed Patents and

intellectual property rights are necessary to manufacture, have manufactured, use, import, distribute, offer to sell, have sold and sell in the United State the Par ANDA Product and any and all components thereof as necessary to make, have made, manufacture, or have manufactured the Par ANDA Product as described in the Par ANDA (the '***Par ANDA Product License***.')).

[32] *Id.* at 17 § 1.3. The Par ANDA Product License allowed Par to "sell and distribute, without any limitation or restriction, [Par's generic of Colcrys] during the period beginning on the first to occur of the following . . . and continuing until the expiration of the last to expire of the Licensed Patents: (a) January 1, 2024; (b) the date of a Final Court Decision (as defined in Exhibit A) holding that all unexpired claims of the Licensed Patents that were asserted and adjudicated against a Third party are invalid, canceled, or unenforceable or not infringed, where the judgment of non-infringement is based on a label that is substantively identical to the Par label that received tentative approval from the FDA on February 12, 2015; (c) [t]he date a Third Party, pursuant to a license or other authorization by Takeda, is permitted to launch a Generic Equivalent . . . or (e) Subject to Par's payment of the Profit Share as applicable, the date that is the earlier of (i) ten (1) business days after the date of a first commercial sale in the Territory by any Third Party without license or authorization by Takeda, of a Generic Equivalent (such Third Party referred to hereafter as the 'Launcher at Risk' or 'LAR.'" *Id.* "Third Party" is defined as "any person other than a Party or an Affiliate to a Party." *Id.* at 29, Ex. A to License Agreement (Definitions). "Affiliate" is defined as "any Person that directly or indirectly controls, is controlled by, or is under common control with any one of the Parties." *Id.* at 27. "Party" is defined as "[e]ach one of Plaintiff and Defendants," collectively "Parties"—here Takeda Pharmaceuticals USA, Inc., Par Pharmaceutical Companies, Inc., and Par Pharmaceutical, Inc. *Id.* at 15.

[33] ECF Doc. No. 123-1, Ex. 2, at 2.

[34] *Id.* at 2, 16. "Subject to Paragraph 1.2 below, Takeda hereby grants Watson and its respective Affiliates a fully paid-up, royalty-free, irrevocable, non-exclusive license under the Licensed Patents and any other intellectual property rights owned or controlled by [Takeda] and its respective Affiliates as of the Effective Date or at any time in the future, which Licensed Patents and intellectual property rights are necessary to (1) manufacture, have manufacture, use, import, distribute, offer to sell, have sold and sell in the Territory the Watson ANDA Product and any and all components thereof as necessary to make, have made, manufacture, or have manufactured the Watson Anda Product as described in the Watson ANDA, and (ii) to make and have made the Watson ANDA Product outside the Territory only for use, sale and importation in or for the Territory (the "***License***")." *Id.* at 16 § 1.1(a).

[35] *Id.* at 16–17 §§ 1.2(a)–(e), (g) ("Subject to the terms of the License in Paragraph 1.1 above, Watson shall be entitled to make, use, import, market, offer for sale, sell, and distribute [Watson's generic of Colcrys] during the period beginning on the first to occur of the following (each, a '***Generic Entry Date***') and continuing until the expiration of the last to expire of the Licensed Patents: (a) October 15, 2020; (b) [t]he date that is one hundred thirty-five days (135) days prior to the date on which a first commercial sale of a Generic Equivalent by a Third Party (other than the Par ANDA Product or the Amneal ANDA Product) is permitted or authorized pursuant to a license or other authorization by Takeda; (c) [t]he date that, pursuant to a license or other authorization by Takeda, Par is permitted to launch the Par ANDA Product or Amneal is permitted to launch the Amneal ANDA Product; (d) [t]he date of a Final Court Decision . . . holding that all

unexpired claims of the Licensed Patents that were asserted and adjudicated against a Third Party are invalid, canceled, or unenforceable or not infringed, where the judgment of a non-infringement is based on a label that is substantively identical to the Watson label that received tentative approval from the FDA on October 6, 2015; (e) the date of a first commercial sale of a Third Party Generic Equivalent following a Final Court decision of non-infringement by that Third Party based on a label *not* substantively identical to the Watson label that received tentative approval from FDA on October 6, 2015 . . . (g) Subject to Watson's payment of the Profit Share as applicable, the date that is the earlier of (i) ten (10) business days after the date of a first commercial sale in the Territory by any Third Party without license or authorization from Takeda of a Generic Equivalent."). They further agreed: "For the avoidance of doubt, all the Generic Entry Dates in this Paragraph 1.2 are subject to any regulatory exclusivity to which the First Filer is entitled." *Id.* at 18. "Third Party" means "a Person other than a Party or an Affiliate of a Party." *Id.* at 33, Ex. A to License (Definitions). "'Affiliate' means any Person that directly or indirectly controls, is controlled by, or is under common control with any one of the Parties." *Id.* "Party" means "[e]ach Plaintiff and Defendant" collectively "Parties" – here, Takeda Pharmaceuticals USA, Inc. and Watson Laboratories, Inc. *Id.* at 15.

[36] ECF Doc. No. 123-2, Ex. 3, at 2.

[37] *Id.* at 2, 18. "Subject to the terms of this License Agreement, including without limitation Paragraph 1.2 below, Takeda hereby grants Amneal and its respective Affiliates (and to the extent necessary, its suppliers, distributors, and customers, as the case may be): a fully paid-up, royalty-free, irrevocable, non-exclusive license under the Licensed Patents and any other intellectual property rights owned or controlled by Plaintiff and its respective Affiliates as of the Effective Date or at any time in the future, which Licensed Patents and intellectual property rights are necessary to manufacture, have manufactured, use, import, distribute, offer to sell, have sold and sell in or for the Territory the Amneal ANDA Product and any and all components thereof as necessary to make, have made, manufacture, or have manufactured the Amneal ANDA Product as described in the Amneal ANDA (the 'License')." *Id.* at 18 § 1.1.

[38] "Pursuant to the License, Amneal shall be entitled to sell and distribute, without any limitation or restriction, [Amneal's generic of Colcrys] during the period beginning on the first to occur of the following (each, a 'Generic Entry Date') and continuing until the expiration of the last to expire of the Licensed Patents: (a) October 15, 2020; (b) [t]he date of a Final Court Decision . . . holding that all Asserted Claims of the Licensed Patents are invalid, canceled, or unenforceable or not infringed, where the judgment of a non-infringement is based on a label that is substantively identical to the Amneal label pending before the FDA as of the Effective Date of this Agreement; (c) [t]he date of a first commercial sale of a Generic Equivalent in the Territory by any third party permitted or authorized pursuant to a license or other written authorization granted to such third party by Takeda . . . (e) Subject to Amneal's payment of the Profit Share as applicable, the date that is the earlier of (i) ten (10) business days after the date of a first commercial sale in the Territory by any Third Party without license or authorization from Takeda of a Generic Equivalent." *Id.* at 18–19 §§ 1.2(a)–(c), (e). They further agreed: "For the avoidance of doubt, all the Generic Entry Dates in this Paragraph 1.2 are subject to any regulatory exclusivity to which the First Filer is entitled." *Id.* at 19. "Third Party" means "a Person other than a Party or an Affiliate of a Party." *Id.* at 32, Ex. A to License (Definitions). "'Affiliate' means any Person that directly or indirectly controls, is controlled by, or is under common control with any one of the Parties . . .

." *Id.* at 30. Party means "[e]ach Plaintiff and Defendant" collectively "Parties" – here, Takeda Pharmaceuticals USA, Inc. and Amneal Pharmaceuticals LLC. ECF Doc. No. 123-2 at 17. We note third party is not used as the defined term "Third Party" in Amneal's settlement agreement. Value Drug nonetheless concedes if Watson enters the market, so does Amneal. *See* ECF Doc. No. 124 at 9 n.7, 10 n.9 (Value Drug admitting Par and Amneal came in when Watson came in).

[39] ECF Doc. No. 1 ¶ 48.

[40] *Id.* ¶ 57 ("Par, Watson, and Amneal would refrain from launching their own generic versions of Colcrys for so long as *non-conspirators* did so. That is, the co-conspirators agreed that if *a non-conspiring seller* of generic Colcrys entered the market, Par, Watson, and Amneal could do so." (emphasis added)).

[41] *Id.* ¶¶ 62, 64, 66.

[42] *Id.* ¶ 63.

[43] *Id.*

[44] *Id.* ¶ 64.

[45] *Id.* ¶ 65.

[46] *Id.* ¶ 66.

[47] *Id.* ¶¶ 62, 65–66.

[48] *Id.* ¶ 7. Value Drug alleges Teva Pharmaceutical Industries Ltd. and Teva Pharmaceuticals USA, Inc. purchased Watson and expressly assumed its liabilities in July 2015 and/or ratified Watson's conduct. *Id.* ¶¶ 12–13. At oral argument, Value Drug conceded Teva Ltd. signed the purchase agreement in July 2015, but the sale did not close until August 2016. The date of the closing is not plead. These facts comprise the extent of Value Drug's allegations involving Teva Ltd. and Teva USA. *See generally* ECF Doc. No. 1.

[49] ECF Doc. No. 1 ¶¶ 1, 7–8, 10–14, 27. Value Drug also sued Endo Pharmaceuticals Inc. We dismissed Endo Pharmaceuticals from the litigation upon the parties' agreement. ECF Doc. No. 125.

[50] ECF Doc. No. 1 ¶¶ 3, 60.

[51] *Id.* ¶¶ 3(a)–(e).

[52] ECF Doc. No. 103.

[53] ECF Doc. No. 107.

[54] ECF Doc. No. 124.

---

[55] ECF Doc. No. 104.

[56] *Id.*

[57] ECF Doc. No. 120.

[58] ECF Doc. No. 106.

[59] *Id.*

[60] *Id.*

[61] Federal Rule of Civil Procedure 12(b)(6) requires the plaintiff state a claim upon which relief can be granted. The purpose of the Rule is to test the sufficiency of the fact allegations. *Sanders v. United States*, 790 F. App'x 424, 426 (3d Cir. 2019). If a plaintiff is unable to plead "enough facts to state a claim to relief that is plausible on its face," the court should dismiss the complaint. *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Kajla v. U.S. Bank Nat'l Ass'n as Tr. for Credit Suisse First Boston MBS ARMT 2005-8*, 806 F. App'x 101, 104 n.5 (3d Cir. 2020) (quoting *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011)). "A claim has facial plausibility when the plaintiff pleads factual content … allow[ing] the court to draw the reasonable inference … the defendant is liable for the misconduct alleged." *Robert W. Mauthe M.D., P.C. v. Spreemo, Inc.*, 806 F. App'x 151, 152 (3d Cir. 2020) (quoting *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017)). While "[t]he plausibility standard is not akin to a 'probability requirement,'" it does require the pleading show "more than a sheer possibility … a defendant has acted unlawfully." *Riboldi v. Warren Cnty. Dep't of Human Servs. Div. of Temp. Assistance & Soc. Servs.*, 781 F. App'x 44, 46 (3d Cir. 2019) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A pleading that merely 'tenders naked assertion[s] devoid of further factual enhancement' is insufficient." *Id.* (quoting *Iqbal*, 556 U.S. at 668).

In determining whether to grant a 12(b)(6) motion, "we accept all well-pleaded allegations as true and draw all reasonable inferences in favor of the plaintiff" but "disregard threadbare recitals of the elements of a cause of action, legal conclusions, and conclusory statements." *Robert W. Mauthe, M.D., P.C.*, 806 F. App'x at 152 (quoting *City of Cambridge Ret. Sys. v. Altisource Asset Mgmt. Corp.*, 908 F.3d 872, 878–79 (3d Cir. 2018)). Our Court of Appeals requires us to apply a three-step analysis to a 12(b)(6) motion: (1) we "'tak[e] note of the elements a plaintiff must plead to state a claim'"; (2) we "identify allegations that … 'are not entitled to the assumption of truth' because those allegations 'are no more than conclusion[s]'"; and, (3) "'[w]hen there are well-pleaded factual allegations,' we 'assume their veracity' … in addition to assuming the veracity of 'all reasonable inferences that can be drawn from' those allegations … and, construing the allegations and reasonable inferences 'in the light most favorable to the [plaintiff]'…, we determine whether they 'plausibly give rise to an entitlement to relief.'" *Oakwood Lab'ys LLC v. Thanoo*, 999 F.3d 892, 904 (3d Cir. 2021) (internal citations omitted); *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016).

[62] 15 U.S.C. § 1.

[63] *In re Insur. Brokerage Antitrust Litig.*, 618 F.3d 300, 314–15, 315 n.9 (3d Cir. 2010); *see also Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 253 (3d Cir. 2010) ("A plaintiff asserting a Section 1 claim also must allege four elements: '(1) concerted action by the defendants; that produced anti-competitive effects within the relevant product and geographic markets; (3) that the concerted actions were illegal; and (4) that it was injured as a proximate result of the concerted action.'") (further citations omitted)).

[64] *In re Insur.*, 618 F.3d at 315 (citing *In re Baby Food Antitrust Litig.*, 166 F.3d 112, 117 (3d Cir. 1999) (further citation omitted)).

[65] *Id.* (citing *In re Baby Food*, 166 F.3d at 117 and *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357 (3d Cir. 2004)) (further citations omitted) (internal quotation omitted).

[66] *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 306 (3d Cir. 2007) (citing 15 U.S.C. § 2).

[67] *Howard Hess Dental Lab'ys Inc.*, 602 F.3d at 253.

[68] *Broadcom Corp.*, 501 F.3d at 307. (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)).

[69] *Id.* at 308.

[70] *Id.* (citing *Verizon Commcn's Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004)).

[71] *Id.*

[72] Takeda raises this argument in a footnote in its opening brief. ECF Doc. No. 103-1 at 12, n.4 (citing ECF Doc No. 1 ¶ 104). Value Drug evidently concedes the point, as Value Drug does not address Takeda's argument—rather only arguing it has adequately plead a conspiracy and Takeda's patents do not immunize anticompetitive conduct.

[73] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) (discussing pleading standard for conspiracy in Sherman Act Section 1 claim); *see also In re Insur.*, 618 F.3d at 320 ("*Twombly's* importance to the case before us, however, goes beyond its formulation of the general pleading standard. *Twombly* is also an essential guide to the application of that standard in the antitrust context, for in *Twombly* the Supreme Court also had to determine whether a Sherman Act claim alleging horizontal conspiracy was adequately pled."). We apply the same pleading standards to a Section 1 and Section 2 conspiracy claim. *See W. Penn Allegheny Health Sys., Inc. v. UPMC*, 627 F.3d 85, 99–100 (3d Cir. 2010).

[74] *In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 438 (E.D. Pa. 2018) (quoting *W. Penn Allegheny Health Sys., Inc.*, 627 F.3d at 99).

[75] *In re Insur.*, 618 F.3d at 324 (quoting *Twombly*, 550 U.S. at 556); *see also In re Processed Egg Prod. Antitrust Litig.*, 821 F. Supp. 2d 709, 717 (E.D. Pa. 2011) (quoting *In re Insur.*, 618 F.3d at 324) (further citations omitted).

[76] *In re Insur.*, 618 F.3d at 324 (quoting *Twombly*, 550 U.S. at 557).

[77] *Id.* (quoting *Twombly*, 550 U.S. at 556).

[78] *In re Processed Egg Prod.*, 821 F.Supp.2d at 718–20 (E.D. Pa. 2011); *see also In re Generic Pharms..*, 338 F. Supp. 3d at 438.

[79] ECF Doc. No. 1 ¶ 54.

[80] *Id.* ¶¶ 3(a)–(e).

[81] *Id.* ¶ 54.

[82] *Id.* ¶ 55.

[83] *Id.*

[84] *Id.*

[85] *Id.* ¶ 56.

[86] *Id.*

[87] *Id.*

[88] *Id.* ¶ 57.

[89] *Id.*

[90] *Id.*

[91] *Id.* ¶ 58.

[92] *Id.* (ellipses in original).

[93] *Id.* (alterations in original).

[94] *Id.* ¶ 59.

[95] *Id.* ¶¶ 58–60. Value Drug posits Takeda had no unilateral interest to stop selling its generic drug through Prasco, Par had no unilateral interest to restrict its output of generic Colcrys for several years and agree to defined period of sales free from other generic competition, and Watson and Amneal had no unilateral economic interests to agree to restrict their output for several years after Par's 180-day exclusivity elapsed. *Id.*

[96] *Id.*

[97] *Id.* ¶ 67.

[98] *Id.* ¶ 68.

[99] *Id.* ¶¶ 69–71.

[100] *In re Insur.*, 618 F.3d at 323–24.

[101] *Id.* at 323–24 n.23; *see also King Drug Co. of Florence, Inc. v. Cephalon, Inc.*, Nos. 06-1797, 06-1833, 06-2768, 2014 WL 2813312, at *6 (E.D. Pa. June 23, 2014) (deciding a motion for summary judgment and finding "[w]hether this evidence is properly considered 'direct' depends on whether the fact-finder would have to take an additional logical step in order to conclude that a conspiracy occurred. In other words, an additional step is indicative of circumstantial evidence. Direct evidence requires no extrapolation, as with 'a document or conversation explicitly manifesting the existence of the agreement in question.") (citing *In re Insur.*, 618 F.3d at 324 n.23)).

[102] ECF Doc. No. 124 at 11–14. Value Drug argues we can take judicial admission of unplead statements made in a different litigation in front of Judge Andrews. We need not decide whether we can consider these statements to defeat the motion to dismiss because the statements are in support of Value Drug's unplead "Second Wave" theory. We further detail Value Drug's argued "Second Wave" theory in the circumstantial evidence section.

[103] ECF Doc. No. 124 at 11–12.

[104] 88 F. Supp. 3d 402 (E.D. Pa. 2015).

[105] *F.T.C. v. Actavis, Inc.*, 570 U.S. 136 (2013); *see also King Drug Co. of Florence*, 88 F. Supp. 3d at 407–410 (detailing the terms of each settlement agreement between the brand and individual generic manufacturers), 422 (denying defendants' motions for summary judgment).

[106] *King Drug Co. of Florence*, 88 F. Supp. 3d at 410 n.9. In this footnote, Judge Goldberg rejected defendants' argument "there exists a 'special,' heightened standard of review for motions for summary judgment in the antitrust context," distinguishing the cases the defendants relied on because the cases addressed "the limited inferences that may be drawn from ambiguous, circumstantial evidence in establishing concerted action . . . ." *Id.* Judge Goldberg found the plaintiffs presented direct evidence of concerted action in the form of the written settlement agreements.

[107] No. 09-2084, 2018 WL 2984873, at *1–4 (N.D. Ga. June 14, 2018). Solvay—the brand drug— sued two generic manufacturers for patent infringement after they made Paragraph IV certifications when filing their Abbreviated New Drug Applications. *Id.* at *2–3. The separate litigations ran on parallel schedules, and on the same day, Solvay settled the individual cases with the generics. *Id.* at *3. Each settlement agreement also contained "business promotion agreements" wherein the brand drug and generic agreed to share profits of the brand drug and the generic agreed to do something—here either promote the brand drug to physicians or serve as a backup supplier

of the brand drug. *Id.* at *4. Judge Thrash found "[t]ogether, these types of settlements are called 'reverse payment' settlements, and they have recently become popular in pharmaceutical litigation." *Id.* at *4. The plaintiffs alleged the defendants violated federal antitrust law by entering into reverse settlement agreements. *Id.* at *5. This contrasts with our case, where the alleged antitrust violation is a single, horizontal conspiracy among all defendants to restrict the output of Colcrys.

[108] *Id.* at *7.

[109] *Id.* (further citations omitted).

[110] *Id.* at *8.

[111] *Id.* We note Value Drug selectively and misleadingly quotes Judge Thrash's reasoning to support its position here.

[112] Value Drug also misplaces reliance on *In re Wellbutrin XL Antitrust Litig.*, 133 F. Supp. 3d 734 (E.D. Pa. 2015) and *United Food & Com. Workers Loc. 1776 & Participating Emps. Health & Welfare Fund v. Teikoku Pharma USA*, 296 F. Supp. 3d 1142 (N.D. Cal. 2017). In *In re Wellbutrin*, the "Wellbutrin Settlement was executed on February 9, 2007" resolving various pending lawsuits between the brand drug and various generic manufacturers and "was comprised of multiple agreements." *In re Wellbutrin XL*, 133 F. Supp. 3d at 745. Not only did the parties sign one settlement agreement (made up of various agreements, including "the Omnibus Agreement"), one generic took the lead initially in negotiating on behalf of *all* generic manufacturers. *Id.* This is not what Value Drug alleges today. Value Drug alleges *separate* settlement agreements between Takeda and Par, Takeda and Watson, and Takeda and Amneal. Value Drug does not allege together these constituted a global settlement agreement, like in *In re Wellbutrin*, nor does it allege either Par, Watson, or Amneal negotiated on behalf of all of them collectively. Similarly, in *United Food & Com. Workers Loc. 1776*, the plaintiffs argued "the Settlement Agreement, **signed by all three defendants**, satisfies the 'contract, combination, or conspiracy' elements" of their antitrust claims. 296 F. Supp. 3d at 1165 (emphasis added). Judge Orrick observed "Defendants **do not dispute this**, although they do dispute the significance, lawfulness, and effect of the various provisions in that Agreement" and therefore granted judgment in favor of plaintiff on the conspiracy element of its claims. *Id.* (emphasis added). We do not have all defendants signing one settlement agreement here. We have individual settlement agreements between Takeda and each generic manufacturer. Nor do the defendants here concede the settlement agreements satisfy the conspiracy claim. Neither of these cases provides teeth to Value Drug's misplaced argument.

[113] *King Drug Co. of Florence, Inc.*, 2014 WL 2813312, at *6. We recognize this case involves a motion for summary judgment and thus a different standard than the one we apply to the motion to dismiss before us. Judge Goldberg's reasoning as to why the bilateral settlement agreements are not direct evidence of a single horizontal conspiracy is nonetheless persuasive.

[114] *Id.* at *1.

[115] *Id.* at *6.

---

[116] *Id.* at *1, 6–7.

[117] *Id.* at *6.

[118] *Id.* at *7.

[119] *See, e.g.*, ECF Doc. No. 1 ¶¶ 53–57.

[120] ECF Doc. No. 148, Tr. 26:12–27:15.

[121] *Id.*, Tr. 27:10–12.

[122] *Cephalon*, 2014 WL 2813312, at *5 (discussing proof of conspiracy by direct evidence and stating "[b]ecause direct evidence of an unlawful conspiracy—a 'smoking gun'—is often unavailable, proof by inferences drawn from circumstantial evidence is the norm.") (citing *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003)) (further citation omitted).

[123] ECF Doc. No. 1 ¶¶ 58–59; *see also* ECF Doc. No. 124 at 13 (characterizing its pleading as judicial admissions to Judge Andrews which "conceded the purpose and effect of the conspiracy and the 'joint venture.'").

[124] ECF Doc. No. 1 ¶¶ 58–59.

[125] *See, e.g. In re Ins.*, 618 F.3d at 321.

[126] *Id.* ("Parallel conduct is, of course, consistent with the existence of an agreement; in many cases where an agreement exists, parallel conduct—such as setting prices at the same level—is precisely the concerted action that is the conspiracy's object. But as the Supreme Court has long recognized, parallel conduct is 'just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'" (quoting *Twombly*, 550 U.S. at 554)).

[127] *Id.* (further citations omitted).

[128] *Id.* (quoting *Flat Glass*, 385 F.3d at 360). Evidence implying a traditional conspiracy "consists of 'non-economic evidence that there was an actual manifest agreement not to compete,' which may include 'proof that the defendants got together and exchanged assurances of common action or otherwise adopted a common plan even though no meetings, conversations, or exchanged documents are shown.'" *Id.* (quoting *Flat Glass*, 385 F.3d at 361) (further citation omitted).

[129] *In re Generic Pharm.*, 338 F. Supp. 3d at 448 (further citation omitted) (alteration in original).

[130] Value Drug does not argue it pleads evidence implying a traditional conspiracy.

[131] ECF Doc. No. 1 ¶¶ 58–60.

[132] *Id.* ¶¶ 3(a)-(e), 54–57.

[133] *Id.* ¶ 3(e).

[134] *Id.* ¶ 57.

[135] *Id.* ¶ 54.

[136] ECF Doc No. 123, Ex. 1, at 16 § 1.1.

[137] ECF Doc No. 123, Ex. 1, at 17 § 1.3.

[138] ECF Doc. No. 123, Ex. 1, at 29, Ex. A to License Agreement (Definitions).

[139] ECF Doc. No. 123-1, Ex. 2, at 16–17 § 1.2.

[140] ECF Doc. No. 123-2, Ex. 3, at 18–19 §§ 1.2.

[141] ECF Doc No. 123, Ex. 1, at 17 § 1.3(c); ECF Doc. No. 123-1, Ex. 2, at 16–17 § 1.2(b); ECF Doc. No. 123-2, Ex. 3, at 18–19 § 1.2(c); *see also* ECF Doc. No. 124 at 9 n.7, 10 n.9 (Value Drug admitting Par and Amneal came in when Watson came in).

[142] We note under Par's license with Takeda, if Par launched its own generic, Par could no longer be the distributor of Takeda's authorized generic. ECF Doc No. 123, Ex. 1, at 16 § 1.1. Even assuming in favor of Value Drug Par decided not to launch and rather continued being Takeda's distributor, Watson still has no exclusivity because the market has branded Colcrys, Takeda's authorized generic, Watson's generic, and Amneal's generic. Conversely, assuming Par did launch *and* Takeda chose to stop distributing its authorized generic, the market is still similarly saturated with the brand drug and three generics. Regardless of whether Par chose to launch its own generic or not, Watson never obtained an exclusive period of time or a scenario where the price collapse Value Drug pleads does not occur. Amneal similarly had no exclusivity in either scenario.

[143] ECF Doc No. 123, Ex. 1, at 17 § 1.3(c); ECF Doc. No. 123-1, Ex. 2, at 16–17 § 1.2(b); ECF Doc. No. 123-2, Ex. 3, at 18–19 § 1.2(c); *see also* ECF Doc. No. 1 ¶ 57.

[144] *See, e.g.*, ECF Doc. No. 124.

[145] Value Drug's allegations in paragraph 57 may be subject to different interpretations. But Value Drug drafted the pleading. And in its briefing, Value Drug swears the "escape clause" it references in paragraph 57 is the escape clauses in each individual settlement agreement. *See, e.g.* ECF Doc. No. 124 at 7 n.1 (discussing entry dates in context of "escape clauses" in settlement agreements); 9 n.7 (same); 10 n.9; 13 n.13 (conceding Par, Watson, and Amneal would all enter at once causing competition from three generics (instead of nine in accordance with Value Drug's new "second wave" theory); 19 n.21 (describing clauses providing entry dates in settlement agreements as "escape clauses"). While we should plausibly infer facts based on the plead facts, we cannot simply create new theories of liability based on arguments attempting to reconstruct sworn allegations. Value Drug's conclusions do not suffice. Its belated arguments attempting to stretch those conclusions into facts also do not suffice.

[146] *See, e.g.*, ECF Doc. No. 124 at 17 (arguing the purpose of the conspiracy is to avoid "the looming Second Wave" of generics).

[147] *Id.* ("By conspiring to order their market entry, Takeda avoided competing against Par, Watson, and Amneal for a period of time, then competed against just the three co-conspirators and avoided a price collapse from the looming Second Wave.").

[148] ECF Doc. No. 1 ¶¶ 3(a)-(e), 4, 56–60, 71.

[149] We do not take a position on whether the "Second Wave" conspiracy is plausible. We simply note Value Drug argues against Takeda, Watson, and Amneal's motions to dismiss arguments by setting forth its unplead second wave theory, not its plead theory of preserving a two-entrant market for as long as possible.

[150] ECF Doc. No. 1 ¶¶ 58–60.

[151] *See, e.g.*, *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1243 (3d Cir. 1993) (finding defendants need not share the same motive in entering a conspiracy, "[r]ather, all that is required is that *they each have* a motive to conspire." (emphasis added)).

[152] *See, e.g.*, *Brunson Commc'ns, Inc. v. Arbitron, Inc.*, 239 F. Supp. 2d 550, 563–64 (E.D. Pa. 2002) (applying reasoning in *Matsushita* to motion to dismiss and quoting "if the defendants 'had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.") Because we find it makes no economic sense to conspire to cause a price collapse upon entry to the market, we cannot find the defendants' conduct is not equally consistent with other plausible explanations—*i.e.*, each generic defendant unilaterally settled its patent litigation with Takeda for reasons other than to restrict generic output.

[153] ECF Doc. No. 106; ECF Doc. No. 1 ¶ 12 (pleading Teva Ltd.'s incorporation and principal place of business in Israel).

[154] ECF Doc. No. 117.

[155] *Id.*

[156] ECF Doc. No. 1 ¶ 12.

[157] *Id.* ¶¶ 12, 17.

[158] *Metcalfe v. Renaissance Marine, Inc.*, 566 F.3d 324, 330 (3d Cir. 2009) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002) and *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1302 (3d Cir.1996)); *see also Middleton v. Trans Union, LLC.*, No. 20-3756, 2021 WL 3674617, at *2 (E.D. Pa. Aug. 19, 2021) ("When reviewing a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), I must accept the plaintiff's allegations as true and resolve disputed facts in favor of the plaintiff . . . However, once a defendant has raised a jurisdictional defense, the plaintiff must 'prove by affidavits or other competent evidence that

jurisdiction is proper.' . . . If an evidentiary hearing is not held, a plaintiff 'need only establish a prima facie case of personal jurisdiction.' . . . A plaintiff meets this burden by 'establishing with reasonable particularity sufficient contacts between the defendant and the forum state.'" (internal citations omitted) (further citations omitted)); *Metro Container Group v. AC&T Co., et al.*, No. 18-3623, 2021 WL 5804374, at *3 (E.D. Pa. Dec. 7, 2021) ("In ruling on a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the Court also takes the allegations of the complaint as true . . . However, once a jurisdictional defense is raised, the plaintiff bears the burden of proving, through affidavits or competent evidence, contacts with the forum state sufficient to establish personal jurisdiction . . . The plaintiff must establish those contacts with reasonable particularity . . . the plaintiff makes out a prima facie case in support of personal jurisdiction, the burden shifts to the defendant to establish that some other considerations exist which would render exercise of personal jurisdiction unreasonable." (internal citations omitted)).

[159] *Metcalfe*, 566 F.3d at 330 (quoting *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007)).

[160] *Id.* (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 457 (3d Cir. 2003)).

[161] *Id.* at 331 (quoting *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 142 n.1 (3d Cir. 1992)).

[162] *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020) (citing 42 Pa. Cons. Stat. § 5322(b) and *Kubik v. Letteri*, 614 A.2d 1110, 1113–14 (Pa. 1992)).

[163] Fed. R. Civ. P. 4(k)(2).

[164] *In re Auto. Refinishing Paint Antitrust Litig.*, 358 F.3d 288, 298 (3d Cir. 2004) ("We hold that personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole. Our holding in *Pinker* and on this appeal is consistent with the Federal Rule of Civil Procedure 4(k)(2). Personal jurisdiction therein is not limited to the defendant's contacts with a particular federal judicial district or the forum state. **We hold further that personal jurisdiction under Section 12 of the Clayton Act is as broad as the limits of due process under the Fifth Amendment.**") (citations omitted) (emphasis added); *see also* ECF Doc. No. 140 at 9–10 ("The parties agree that, under Third Circuit precedent, the Clayton Act's provision for nationwide service coupled with Federal Rule of Civil Procedure 4(k)(2) means that the Fifth Amendment (not the Fourteenth Amendment) governs the relevant constitutional inquiry . . . The parties also agree that, under Third Circuit precedent, 'personal jurisdiction in federal antitrust litigation is assessed on the basis of a defendant's aggregate contacts with the United States as a whole.'"); ECF Doc. No. 117 at 14–16 (discussing jurisdiction under Fed. R. Civ. P. 4(k)(2) and the Clayton Act).

[165] *See Max Daetwyler Corp. v. R. Meyer*, 762 F.2d 290, 293 (3d Cir. 1985) (discussing contacts analysis under patent law, noting the Fifth Amendment "has been construed to impose a general fairness test incorporating *Internal Shoe's*" requirements, and acknowledging "even if the relevant area in delineating contacts were the United States as a whole, we would nonetheless be required to ask whether the quality and quantity of [the defendant's] contacts were constitutionally adequate to support personal jurisdiction. For although the present fifth amendment due process inquiry

need not address concerns of interstate federalism, it must still consider the remaining elements of the minimum contacts doctrine as developed by *International Shoe* and its progeny" but declining to adopt nationwide contacts analysis in case because no federal statute allowing nationwide service of process within patent laws); *In re Diisocyanates Antitrust Litig.*, No. 18-1001, 2020 WL 1140245, at *2 (W.D. Pa. Mar. 9, 2020) (applying same personal jurisdiction analysis to antitrust case involving nationwide contacts); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 558 (M.D. Pa. 2009) (same); *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-2445, 2017 WL 4642285, at *3 (E.D. Pa. Oct. 17, 2017) (same); *see also Livnat v. Palestinian Auth.,* 851 F.3d 45, 54 (D.C. Cir. 2017) ("To be sure, neither the Supreme Court nor this court has expressly analyzed whether the Fifth and Fourteenth Amendment standards differ. But the Second, Sixth, Seventh, Eleventh, and Federal Circuits have, and all agree that there is no meaningful difference in the level of contacts required for personal jurisdiction. The only difference in the personal-jurisdiction analysis under the two Amendments is the *scope* of relevant contacts: Under the Fourteenth Amendment, which defines the reach of state courts, the relevant contacts are state-specific. Under the Fifth Amendment, which defines the reach of federal courts, contacts with the United States as a whole are relevant. That difference is not at play in this case." (citations omitted)).

[166] ECF Doc. No. 117 at 20, 23–24.

[167] Value Drug argues we "should not [] ignore[]" its evidence regarding alter ego jurisdiction. ECF Doc. No. 151 at 9 n.5. While Value Drug is correct our inquiry on a 12(b)(2) motion is not limited to pleadings—in fact a Plaintiff may not rest on its pleading when jurisdiction is challenged—Value Drug is incorrect it can rest on an unplead theory for personal jurisdiction merely by providing evidence of its unplead theory once jurisdiction is challenged. The very case Value Drug relies on for its argument illustrates this principle. *See In re Chocolate Confectionary Antitrust Litig.*, 641 F. Supp. 2d 367, 381 (M.D. Pa. 2009) ("Although plaintiffs bear the ultimate burden of proving personal jurisdiction by a preponderance of the evidence, such a showing is unnecessary at the preliminary stages of litigation . . . **Rather, plaintiffs must merely allege sufficient facts to establish a prima facie case of jurisdiction over the person. Once these allegations are contradicted by an opposing affidavit, however, plaintiffs must present similar evidence in support of personal jurisdiction** . . . '[A]t no point may a plaintiff rely on the bare pleadings alone in order to withstand a defendant's Rule 12(b)(2) motion to dismiss for lack of in personam jurisdiction . . . Once the motion is made, plaintiff must respond with actual proofs, not mere allegations.' When the plaintiff responds with affidavits or other evidence in support of its position, the court is bound to accept these representations and defer final determination as to the merits of the allegations until a pretrial hearing or the time of trial." (internal citations omitted) (emphasis added)).

[168] *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (quoting *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. 915, 919 (2011)) (alteration in original).

[169] *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021) (internal citations omitted) (citing *Goodyear*, 564 U.S. at 919 and *Daimler*, 571 U.S. at 137).

[170] ECF Doc. No. 1 ¶ 12.

[171] *Daimler*, 571 U.S. at 139 n.19.

[172] *Chavez v. Dole Food Co., Inc.*, 836 F.3d 205, 223 (3d Cir. 2016) (alteration and emphasis in original) (quoting *Monkton Ins. Servs., Ltd. v. Ritter*, 768 F.3d 429, 432 (5th Cir. 2014)).

[173] ECF Doc. No. 117 at 19 ("Teva Ltd. cannot continuously and systematically avail itself of the privileges of U.S. capital investment, U.S. intellectual property protections, U.S. federal courts, and U.S. consumer market access as if at home in the U.S., as it has at all relevant times, without also having to answer for its U.S. wrongdoings.").

[174] *Ford Motor Co.*, 141 S. Ct. at 1024–25 (further citations omitted).

[175] ECF Doc. No. 117.

[176] *See, e.g.*, *Toys "R" Us, Inc.*, 318 F.3d at 456 ("Although the plaintiff bears the burden of demonstrating facts that support personal jurisdiction . . . courts are to assist the plaintiff by allowing jurisdictional discovery unless the plaintiff's claim is 'clearly frivolous.' If a plaintiff presents factual allegations that suggest 'with reasonable particularity' the possible existence of the requisite 'contacts between [the party] and the forum state, the plaintiff's right to conduct jurisdictional discovery should be sustained.") (internal citations omitted). Our Court of Appeals found "the record before the District Court contained sufficient non-frivolous allegations (and admissions) to support the request for jurisdictional discovery." *Id.*

[177] ECF Doc. No. 1 ¶ 17.

[178] *Massachusetts Sch. of L. at Andover, Inc. v. Am. Bar Ass'n*, 107 F.3d 1026, 1042 (3d Cir. 1997) ("The district court found (at least by implication), and we agree, that [plaintiff's] jurisdictional claims were clearly frivolous. Our result is in accord with other cases which hold that a mere unsupported allegation that the defendant 'transacts business' in an area is 'clearly frivolous.'"); *see also Falcone v. WiredLogic, Inc.,* No. 06-800, 2006 WL 8459813, at *6 (E.D. Pa. Oct. 26, 2006) ("[M]ere unsupported allegations that a defendant 'transacts business,' has 'contacts,' or 'expressly targeted Pennsylvania residents' are clearly frivolous and discovery will be denied.").

[179] *See, e.g.*, ECF Doc. No. 117.

[180] *See, e.g., id.*

[181] We again note Value Drug does not plead an alter ego or agency theory. Thus, Value Drug's inquiry must not undertake to establish jurisdiction through Teva Ltd.'s subsidiaries' contacts with the United States and involvement with Colcrys.

[182] Because we apply Pennsylvania law to determine personal jurisdiction over Teva Ltd., and because the parties dispute which law may apply *substantively* to Value Drug's theory of successor liability, our finding as to personal jurisdiction has no bearing on whether Teva Ltd. may be liable as a successor under a potentially applicable law besides Pennsylvania.

[183] ECF Doc. No. 1 ¶ 12 (merely pleading a legal conclusion and no further facts in the Complaint about ratification); ECF Doc. No. 117 at 8, 26 (citing to no evidence in the record supporting its ratification theory).

[184] *Falcone*, 2006 WL 8459813, at *9 (quoting *Huth v. Hillsboro Ins. Mgmt.*, 72 F. Supp. 2d 506, 510 (E.D. Pa. 1990) (citing *Simmers v. Am. Cyanamid Corp.*, 576 A.2d 376, 381 (Pa. Super. 1990)).

[185] *Id.* (citing *Umac, Inc. v. Aqua-Gas AVK Ltd.*, No. 04-4022, 2005 WL 742497, at *3 (E.D. Pa. Mar. 30, 2005)).

[186] ECF Doc. No. 1 ¶ 12; *see also Falcone*, 2006 WL 8459813, at *9 ("Under Pennsylvania law, 'when one company sells or transfers all of its assets to another company, the purchasing or receiving company is not responsible for the debts and liabilities of the selling company simply because it acquired the seller's property.' However, this general rule of non-liability can be overcome if the plaintiff demonstrates that '(1) the purchaser expressly or implicitly agreed to assume liability, (2) the transaction amounted to a consolidation or merger, (3) the purchasing corporation was merely a continuation of the selling corporation, (4) the transaction was fraudulently entered into to escape liability, or (5) the transfer was without adequate consideration and no provisions were made for creditors of the selling corporation.'" (internal citations omitted)).

[187] ECF Doc. No. 1 ¶ 11 ("Defendant Watson Laboratories, Inc. ***is*** a Nevada Corporation having places of business at 311 Bonnie Circle, Corona, CA 92878 and Morris Corporate Center III, 400 Interpace Parkway, Parsippany, NJ 07054." (emphasis added)).

[188] *In re Suboxone (Buprenorphine Hydrochloride & Naloxone) Antitrust Litig.*, No. 13-2445, 2017 WL 4810801, at *6 (E.D. Pa. Oct. 25, 2017).

[189] *Id.*

[190] *Id.* at *7 (citing *Norfolk S. Ry. Co. v. Pittsburgh & W. Va. R.R.*, 153 F. Supp. 3d 778, 807 (W.D. Pa. 2015)); *see also In re Welding Fume Products Liab. Litig.*, No. 03-17000, 2010 WL 2403355, at *7 (N.D. Ohio June 11, 2010) ("Of course, if the original entity still exists, there is no successor—and no successor liability.")

[191] *In re Suboxone*, 2017 WL 4810801, at *6 (citing *Lehman Bros. Holdings v. Gateway Funding Diversified Mtg. Servs., L.P.*, 989 F. Supp. 2d 411, 436 (E.D. Pa. 2013)).

[192] *Id.* (citing *Norfolk*, 153 F. Supp. 3d at 808).

[193] Interestingly, Value Drug also cites the case the plaintiffs in *In re Suboxone* relied on—*Town of Lexington v. Pharmacia Corp.*, No. 12-11645, 2015 WL 1321457 (D. Mass. Mar. 24, 2015)—in its sur-reply. ECF Doc. No. 136 at 11. Value Drug cites it for the proposition it is "the general rule . . . that 'a successor who assumes liabilities of its predecessor may not escape liability simply because the predecessor lives on.'" *Id.*

[194] *In re Suboxone*, 2017 WL 4810801, at *8 n.10.

[195] *See, e.g., id.* at *7–8; *Fend v. Allen-Bradley Co.*, No. 17-01701, 2019 WL 6242119, at *1 (E.D. Pa. Nov. 20, 2019) (rejecting successor theory because predecessor entity still existed); *Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R.*, 153 F. Supp. 3d 778, 807 (W.D. Pa. 2015), *aff'd*, 870 F.3d 244 (3d Cir. 2017) (post-trial memorandum addressing successor liability under Pennsylvania law and finding "[i]f the original entity still exists, however, there is no successor, and therefore, no successor liability"); *Norfolk S. Ry. Co. v. Pittsburgh & W. Virginia R.R. & Power Reit*, No. 11-1588, 2014 WL 2808907, at *16 (W.D. Pa. June 19, 2014) (denying summary judgment on successor theory when plaintiffs argued under the fraudulent purpose and de facto merger/mere continuation exceptions to general rule (later addressing the same in *Norfolk S. Ry. Co.*, 153 F. Supp. 3d at 807) and noting it did not find any binding precedent on this issue but "[s]everal outside jurisdictions have recognized that the continued existence of a predecessor forecloses the availability of successor liability"); *Hyjurick v. Commonwealth Land Title Ins. Co.*, No. 11-1282, 2012 WL 1463633, at *4 (M.D. Pa. Apr. 27, 2012) ("The facts alleged in the complaint, however, do not implicate successor liability. Commonwealth is alleged to be a separate corporate entity. Fidelity cannot be Commonwealth's successor if Commonwealth exists as a separate corporation, albeit one that is a wholly owned subsidiary."); *see also Phila. Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 307, 309 (3d Cir. 1985) (finding successor liability under Pennsylvania law when an express assumption occurred but the predecessor entity had been dissolved).

[196] Value Drug relies on *Eagle Nat'l Bank v. ISCP Funding, LLC*, to argue Pennsylvania law does not require the predecessor entity to cease existence when there is an express assumption of liabilities. No. 00685, 2011 WL 10525397, at *2–3 (Pa. Com. Pl. May 3, 2011). The case is inapposite. It does not address successor liability, nor does it involve a claim from a plaintiff trying to establish liability over a defendant under a successor theory. Rather, the case involved the sellers of a company suing the purchaser seeking a preliminary injunction to enjoin the purchaser from using certain disputed funds transferred during the sale. *Id.* at *1–2. In *Eagle National Bank*, the sellers transferred their assets to the purchaser, "including reserve deposits held for the benefit of the branch offices." *Id.* at *2. Certain branches disclaimed affiliation with the purchaser and requested the sellers release any funds in the reserve deposits. *Id.* The sellers forwarded the request to release the funds to the purchaser—who then owned the reserve deposits. *Id.* The purchaser disclaimed it had to pay the branches the deposits. *Id.* The sellers sought a preliminary injunction to stop the purchaser from using the money in dispute, which the sellers transferred to the purchaser during the sale and the sellers argued the purchaser agreed to pay in the purchase agreement when it assumed certain liabilities. *Id.* Judge Bernstein issued the preliminary injunction finding the elements satisfied. *Id.* at *5. The case thus did not involve the issue we have before us nor did it address successor liability.

[197] ECF Doc. No. 131 at 13–14.

[198] 28 U.S.C. § 1927.

[199] *LaSalle Nat. Bank v. First Connecticut Holding Grp., LLC*, 287 F.3d 279, 288 (3d Cir. 2002) (further citations omitted).

[200] *Id.* (further citations omitted) (emphasis in original).

---

[201] *Id.* at 289 (further citations omitted) (alteration in original).

[202] *Id.*